1  **FARUQI & FARUQI, LLP**
   David E. Bower SBN 119546
2  10866 Wilshire Boulevard, Suite 1470
   Los Angeles, CA 90024
3  Telephone: (424) 256-2884
   Facsimile: (424) 256-2885
4  Email: dbower@faruqilaw.com

5

6  *Attorneys for Lead Plaintiff*

7

8              **UNITED STATES DISTRICT COURT**
               **CENTRAL DISTRICT OF CALIFORNIA**
9

10  GARY VARJABEDIAN, On Behalf of Himself       )   Case Number 8:15-cv-
    and All Others Similarly Situated,           )   00554-CJC-JCG
11                                               )
                            Plaintiff,           )
12                                               )   **AMENDED CLASS**
                      v.                         )   **ACTION COMPLAINT**
13                                               )   **FOR VIOLATION OF**
    EMULEX CORPORATION, BRUCE C.                 )   **SECTIONS 14(d)4 , 14(e)**
14  EDWARDS, JEFFREY W. BENCK,                   )   **AND 20(a) OF THE**
    GREGORY S. CLARK, GARY J.                    )   **SECURITIES**
15  DAICHENDT, PAUL F. FOLINO, BEATRIZ           )   **EXCHANGE ACT OF**
    V. INFANTE, JOHN A. KELLEY, RAHUL N.         )   **1934 AND 17 C.F.R. §**
16  MERCHANT, NERSI NAZARI, DEAN A.              )   **240.14d-9**
    YOOST, AVAGO TECHNOLOGIES                    )
17  WIRELESS (U.S.A.) MANUFACTURING,             )
    INC., and  EMERALD MERGER SUB, INC.,         )
18                                               )   **JURY TRIAL**
                                                 )   **DEMANDED**
19                          Defendants.          )

20

21          Lead Plaintiff Jerry Mutza ("Lead Plaintiff"), on behalf of himself and all

22  others similarly situated, by his attorneys, alleges the following upon information and

23  belief, except as to those allegations specifically pertaining to Lead Plaintiff and his

24  counsel, which are made on personal knowledge, based on the investigation

25  conducted by Lead Plaintiff's counsel.  That investigation included reviewing and

26  analyzing information concerning Avago Technologies Wireless (U.S.A.)

27  Manufacturing, Inc. ("Avago") acquisition of Emulex Corporation ("Emulex" or the

28

                               - 1 -
                AMENDED CLASS ACTION COMPLAINT

"Company"), which Lead Plaintiff (through his counsel) obtained from, among other sources: i) Publicly available press releases, news articles, and other media reports; ii) Publicly available financial information concerning Emulex; and iii) Filings with the U.S. Securities and Exchange Commission ("SEC") made in connection with the Transaction (defined below).

## NATURE OF THE CASE

1.     This is a stockholder class action on behalf of the former holders of the common stock of Emulex, against Emulex, certain officers and/or directors of Emulex (the "Individual Defendants" or "Board"), Avago, and Emerald Merger Sub, Inc. ("Merger Sub" and collectively with the Individual Defendants, Emulex and Avago, the "Defendants"), for their violations of Sections 14(d)(4) , 14(e) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.SC. §§ 78n(d)(4),78n(e), 78t(a), and SEC Rule 14d-9, 17 C.F.R. §240.14d-9(d) ("Rule 14d-9").

2.     Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading Schedule 14D-9 Solicitation/Recommendation Statement ("Recommendation Statement") to be filed with the SEC[1].   The Recommendation Statement recommended that Emulex stockholders tender their shares pursuant to the terms of a tender offer (the "Tender Offer"), whereby Avago acquired all the outstanding shares of common stock of Emulex for $8.00 per share (the "Merger Consideration").

3.     On February 25, 2015, Emulex, Avago and Merger Sub entered into a definitive Agreement and Plan of Merger (the "Merger Agreement").   Concurrently with the execution of the Merger Agreement, certain Emulex directors and executive

---

[1]     Emulex, Inc., Solicitation/Recommendation Statement (Schedule 14D-9) (April 7, 2015), http://www.sec.gov/Archives/edgar/data/350917/ 0001571049150 02655/t1500561_sc14d9.htm (last visited Sept. 11, 2015).

AMENDED CLASS ACTION COMPLAINT

1   officers entered into a Tender and Support Agreement ("Support Agreement") with

2   Avago and Merger Sub, pursuant to which they agreed to tender their Emulex shares,

3   representing 2.5% of Emulex outstanding public stock, in the Tender Offer.

4        4.    Pursuant to the terms of the Merger Agreement, Avago commenced the

5   Tender Offer on April 7, 2015.  The Tender Offer expired at 12:00 midnight EST on

6   May 5, 2015, with only 60.58% of the outstanding shares of the Company's common

7   stock tendered.   Following the completion of the Tender Offer, Merger Sub merged

8   with and into Emulex, with Emulex surviving as a wholly owned subsidiary of Avago

9   (the "Merger" and together with the Tender Offer, the "Transaction").

10        5.    The $8.00 per share Merger Consideration was inadequate, as Emulex

11  had experienced significant growth in the months leading up to the Tender Offer and

12  had consistently exceeded management's revenue and earnings expectations.  The

13  Merger Consideration also failed to adequately value Emulex's product portfolio and

14  prospects for future growth.

15        6.    Defendants also agreed to unreasonable deal-protection devices that

16  unfairly favored Avago and discouraged other potential bidders from submitting a

17  superior offer for the Company.   These preclusive devices included: (i) a non-

18  solicitation provision that restricted the Board from soliciting other potentially

19  superior offers for the Company; (ii) an "information rights" provision, which

20  provided Avago with unfettered access to information about other potential

21  proposals, gave Avago four business days to match any competing offer, and

22  provided Avago with the perpetual right to attempt to match any superior bid; and

23  (iii) a termination fee of $19.5 million, which deterred other potential suitors from

24  making a superior proposal.

25        7.    As discussed below, the consideration Emulex stockholders received in

26  connection with the Transaction and the process by which Defendants consummated

27  the Transaction were fundamentally unfair to Lead Plaintiff and the other common

28

1   stockholders of the Company.  Defendants asked Emulex stockholders to tender their

2   shares for inadequate consideration based upon the materially incomplete and

3   misleading representations and information contained in the Recommendation

4   Statement, in violation of Sections 14(d)(4), 14(e), and 20(a) of the Exchange Act.

5   Specifically, Defendants intentionally or recklessly omitted from the

6   Recommendation Statement a material financial analysis performed by Goldman,

7   Sachs & Co. ("Goldman Sachs"), the Board's financial advisor, commonly referred to

8   as a "Precedent Transactions Analysis" or "Premium Analysis", and entitled the

9   "Selected Semiconductor Transactions" Analysis in Goldman Sachs' presentations to

10  the Board (*See* Exhibit A, filed herewith, at ELX91.  And the reason for that is clear

11  – **the analysis showed that the premium Emulex's stockholders ultimately**

12  **received in connection with the Transaction was drastically below the premium**

13  **stockholders of similar companies had received in connection with comparable**

14  **transactions in recent years**.  Specifically, Goldman Sachs' analysis showed that

15  while the median premium over the target company's undisturbed stock price for the

16  transactions it reviewed was **50.8%,** Emulex's stockholders only received a **26.4%**

17  premium to Emulex's closing price on the last trading day prior to the date the

18  Transaction was announced; and while the median premium over the target

19  company's 52-week high price for the transactions Goldman Sachs reviewed was

20  **17.6%,** Emulex's stockholders only received a **4.8%** premium based on the

21  Company's 52-week high closing price.

22        8.    Despite having been presented with and reviewing Goldman Sachs'

23  Selected Semiconductor Transaction Analysis before voting to approve the

24  Transaction,  and thus knowing that the premium Emulex's stockholders would

25  receive paled in comparison to the premiums stockholders had received in connection

26  with similar transactions in recent years, the Defendants nonetheless misleadingly

27  touted the premium to Emulex's stockholders in the Recommendation Statement.

28

1  Indeed, the Recommendation Statement states that the premium Emulex's
2  stockholders stood to receive was one of the factors the Board believed supported its
3  recommendation that Emulex's stockholders tender their shares in the Tender Offer.
4  The Recommendation Statement thus creates the materially misleading impression
5  that the premium Emulex's stockholders received was significant, or at the very least
6  in line with premiums obtained in similar transactions, when in reality, the premium
7  was drastically below the premiums stockholders had received in connection with
8  similar merger transactions in recent years.

9       9.    For these reasons and as set forth in detail herein, Lead Plaintiff seeks to
10  recover damages resulting from the Individual Defendants' violations of the
11  Exchange Act.

12  **JURISDICTION AND VENUE**

13       10.    The claims asserted herein arise under Sections 14(d),14(e), and 20(a) of
14  the Exchange Act, 15 U.S.C. §78n.  The Court has subject matter jurisdiction
15  pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

16       11.    This Court has personal jurisdiction over all of the Defendants because
17  each is either a corporation that conducts business in and maintains operations in this
18  District, or is an individual who either is present in this District for jurisdictional
19  purposes or has sufficient minimum contacts with this District so as to render the
20  exercise of jurisdiction by this Court permissible under traditional notions of fair play
21  and substantial justice.

22       12.    Venue is proper in the Central District of California under Section 27 of
23  the Exchange Act, 15 U.S.C. §78aa, as well as pursuant to 28 U.S.C. §1391, because
24  Emulex maintains its world headquarters in this District, each Defendant transacted
25  business in this District, and a substantial part of the events or omissions giving rise
26  to Lead Plaintiff's claims occurred in this District.

27

28
- 5 -
AMENDED CLASS ACTION COMPLAINT

**PARTIES**

13.     Lead Plaintiff held shares of common stock of Emulex at all relevant times prior to the completion of the Transaction, at which time his ownership stake in the Company was extinguished for the inadequate Merger Consideration.   Lead Plaintiff is a citizen of Wisconsin.

14.     Defendant Emulex is incorporated under the laws of Delaware and maintains its world headquarters and principles executive offices in Costa Mesa, California.   Emulex provides converged networking solutions for data centers. The Company's product portfolio consists of storage adapters, network interface cards, encrypting adapters, controller chips, server management chips, embedded bridges, switches and routers, and connectivity management software.    The Company's common stock was listed on the New York Stock Exchange under the symbol "ELX" until the Transaction was consummated.

15.     Defendant Bruce C. Edwards ("Edwards") served as a director of Emulex from May 2000 and as Chairman of the Board since March 2014 through the date the Transaction was consummated.    Edwards was also Chairman of the Compensation Committee of the Board.  Edwards is a citizen of California.

16.     Defendant Jeffrey W. Benck ("Benck") served as a director, Chief Executive Officer and President of Emulex until the date the Transaction was consummated.  Benck joined Emulex in August 2010 as Executive Vice President and Chief Operating Officer and was subsequently appointed as President and Chief Operating Officer in August 2010.  Benck was named a director of Emulex and President and Chief Executive Officer of the Company in July 2013.  Benck is a citizen of California.

17.     Defendant Gregory S. Clark ("Clark") served as a director of Emulex from April 2013 through the date the Transaction was consummated.  Clark is a citizen of California.

AMENDED CLASS ACTION COMPLAINT

18.    Defendant Gary J. Daichendt ("Daichendt") served as a director of Emulex from February 2014 through the date the Transaction was consummated. Daichendt is also a member of the board of directors of Juniper Networks, Inc. ("Juniper Networks"), along with Individual Defendant Rahul N. Merchant. Daichendt is a citizen of California.

19.    Defendant Paul F. Folino ("Folino") served as director of Emulex through the date the Transaction was consummated.  Folino joined Emulex in May 1993 as President, Chief Executive Officer and director.  Folino was appointed Chairman of the Board in July 2002 and was subsequently appointed to the office of Executive Chairman of Emulex and Chairman of the Board of Directors in September 2006.  Folino is a citizen of California.

20.    Defendant Beatriz V. Infante ("Infante") served as a director of Emulex from May 2012 through the date the Transaction was consummated.  Infante is a citizen of California.

21.    Defendant John A. Kelley ("Kelley") was a director of Emulex at all relevant times through the date the Transaction was consummated.  Kelley is a citizen of Colorado.

22.    Defendant Rahul N. Merchant ("Merchant") served as a director of Emulex from February 2014 through the date the Transaction was consummated. Merchant is also a member of the board of directors of Juniper Networks.  Merchant is a citizen of New Jersey.

23.    Defendant Nersi Nazari ("Nazari") served as a director of Emulex from June 2011 through the date the Transaction was consummated.  Nazari is a citizen of California.

24.    Defendant Dean A. Yoost ("Yoost") served as a director of Emulex from August 2005 through the date the Transaction was consummated.  Yoost is a citizen of California.

- 7 -

AMENDED CLASS ACTION COMPLAINT

25.     Defendant Avago is incorporated under the laws of Delaware and maintains its principle executive offices at 350 West Trimble Road, San Jose, California 95131.

26.     Defendant Merger Sub is a Delaware corporation and a wholly-owned subsidiary of Avago, and was created for purposes of effectuating the Transaction.

## CLASS ACTION ALLEGATIONS

27.     Lead Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of the other former public stockholders of Emulex who were harmed by Defendants' actions described herein (the "Class"). The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

28.     This action is properly maintainable as a class action.

29.     The Class is so numerous that joinder of all members is impracticable. As of January 21, 2015 Emulex had in excess of 71 million shares of common stock outstanding.  Members of the Class are dispersed throughout the United States and are so numerous that it is impracticable to bring them all before this Court.

30.     Questions of law and fact exist that are common to the Class and predominate over any questions affecting only individual Class members, including, among others:

(a)     whether the Defendants have violated Sections 14(d)(4) , 14(e) and 20(a) of the Exchange Act in connection with the Transaction; and

(b)     whether Lead Plaintiff and the other members of the Class were harmed by the actions of Defendants complained of herein.

31.     Lead Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Lead Plaintiff's claims are typical of the claims of the other members of the Class and Lead Plaintiff has the

- 8 -

1   same interests as the other members of the Class.  Accordingly, Lead Plaintiff is an

2   adequate representative of the Class and will fairly and adequately protect the

3   interests of the Class.

4        32.   The prosecution of separate actions by individual members of the Class

5   would create the risk of inconsistent or varying adjudications with respect to

6   individual members of the Class, which would establish incompatible standards of

7   conduct for Defendants, or adjudications with respect to individual members of the

8   Class which would, as a practical matter, be dispositive of the interests of the other

9   members not parties to the adjudications or substantially impair or impede their

10   ability to protect their interests.

11        33.   Defendants have acted, or refused to act, on grounds generally

12   applicable and causing injury to the Class, rendering final injunctive relief or

13   corresponding declaration relief appropriate with respect the Class as a whole.

14        34.   The class mechanism is superior to other available means for the fair and

15   efficient adjudication of the claims of Lead Plaintiffs and Class members.  Each

16   individual Class member may lack the resources to undergo the burden and expense

17   of individual prosecution of the complex and extensive litigation necessary to

18   establish Defendants' liability.  Individualized litigation increases the delay and

19   expense to all parties and multiplies the burden on the judicial system presented by

20   the complex legal and factual issues of this case.  Individualized litigation also

21   presents a potential for inconsistent or contradictory judgments.  In contrast, the class

22   action device presents far fewer management difficulties and provides the benefits of

23   single adjudication, economy of scale, and comprehensive supervision by a single

24   court on the issue of Defendants' liability.  Class treatment of the liability issues will

25   ensure that all claims and claimants are before this Court for consistent adjudication

26   of the liability issues.

27

28

AMENDED CLASS ACTION COMPLAINT

## SUBSTANTIVE ALLEGATIONS

### A. Emulex's Background & Recent Financial Performance

35.     Founded in 1979 and headquartered in Costa Mesa, California, Emulex is a leader in network connectivity, monitoring and management solutions for global networks that support enterprise, cloud, government and telecommunications. Emulex provides connectivity, monitoring and management solutions for high-performance networks, delivering provisioning, end-to-end application visibility, optimization and acceleration for the next generation of software-defined, telco and Web-scale data centers.  The Company's I/O connectivity portfolio, which has been designed into server and storage solutions from leading OEMs and ODMs worldwide, enables organizations to manage bandwidth, latency, security and virtualization.  The Emulex network visibility portfolio enables global organizations to monitor and improve application and network performance management.  Emulex sells its products to original equipment manufacturers, original design manufacturers, and end users, as well as through various distribution channels, including value added resellers, systems integrators, industrial distributors, direct market resellers, and other resellers.

36.     The Company is a leading supplier of fiber-channel and related products selling primarily into server and enterprise storage OEM's.  Emulex's fiber-channel business is considered to be very sustainable, and potential competitors face significant barriers to entry into the market.  Accordingly, Emulex is likely to maintain its stronghold on the relevant market, which is expected to continue to grow.

37.     Recognizing Emulex's intrinsic value and strong prospects for long-term growth, one of its competitors, Broadcom Corporation, submitted an $11 per share bid for the Company in 2009.  The members of the Emulex board at that time, which included Individual Defendants Bruce C. Edwards, Paul F. Folino, and Dean A. Yoost, rejected Broadcom's offer on July 9, 2009.

AMENDED CLASS ACTION COMPLAINT

38.     In its July 2009 press release announcing its rejection of the Broadcom offer, Emulex stated that Broadcom's offer "significantly undervalue[d] Emulex's long-term prospects, [was] inadequate, and [was] not in the best interests of Emulex and its stockholders."

39.     The Company's decision to reject the Broadcom bid, which was $3 or 37.5% higher than the $8 per share offer the Board accepted in connection with the Transaction, was heavily criticized by many of the Company's stockholders, including activist hedge-funds with significant holdings.

40.     On December 5, 2012, Emulex announced its intent to acquire Endace Limited ("Endace"), a New Zealand company that specialized in network performance management, for $130 million.

41.     The members of the Emulex board and/or management that approved the Endace acquisition included Individual Defendants Bruce C. Edwards, Jeffrey W. Benck, Paul F. Folino, Beatriz V. Infante, Nersi Nazari, and Dean A. Yoost.

42.     The Company's decision to purchase Endace was heavily criticized by many of the Company's stockholders, including activist hedge-funds with significant holdings.

43.     For example, Elliott Associates, L.P. and certain affiliated entities (together, "Elliott"), one of the Company's largest stockholders, stated that the Company should not waste its money on what it considered to be a pointless acquisition.  And Altai Capital Management, L.P. (Altai Capital"), another of the Company's largest stockholders, stated that it was "perplexed by the Company's recent announcement to acquire Endace ... We would have preferred that Emulex use its strong net cash balance to continue to repurchase its undervalued shares."[2]

---

[2]     Chris Mellor, *Boardroom brouhahah brewing at Emulex after Endace buy*, The Register (Apr. 2, 2013), http://www.theregister.co.uk/2013/04/02/emulex_elliott/ (last visited Sept. 11, 2015).

AMENDED CLASS ACTION COMPLAINT

44.     Despite the heavy criticism, Emulex completed its acquisition of Endace on April 1, 2013.

45.     In November 2013, Emulex embarked on a strategic restructuring initiative to maximize stockholder value by cutting costs, refocusing the Company's product lines and implementing a major stock repurchase.  Since then, Emulex has introduced well-received products and product enhancements.   The price of the Company's stock dipped in late April 2014 following revenue and earnings below analysts' expectations in the third quarter of the Company's fiscal year 2014 due, in part, to restructuring costs.   However, by January 2015, the price of Emulex stock had recovered nearly all of the value lost in mid-2014.

46.     Emulex announced impressive financial results during the fiscal quarters preceding the consummation of the Transaction, which caused its stock price to increase by approximately 42% between October 2014 and the time the Transaction was announced in late-February 2015, as reflected by the graph below:



AMENDED CLASS ACTION COMPLAINT

47.     On October 30, 2014, the Company announced the following impressive results for the first quarter of 2015: Total revenue was $104 million, up 4% sequentially and **above the $93 million to $99 million initial guidance range** provided during the Company's fiscal fourth quarter earnings call, driven by strength in Network and Storage Connectivity Products; non-GAAP diluted earnings of $0.14 and a GAAP loss of $0.01 per share as compared to guidance of $0.07 - $0.11 on a non-GAAP basis and a $0.07 - $0.11 loss on a GAAP basis; non-GAAP operating income of $13 million, up 90% versus the prior quarter, reflecting stronger revenue performance, consistent non-GAAP gross margin, and operational discipline; and $21 million in cash from operations in the quarter with an ending cash, cash equivalents, and investments balance of $174 million.

48.     Commenting on the strong first quarter results, Individual Defendant Benck stated:

> We entered our fiscal 2015 on strong footing, with solid performance across multiple categories including our Ethernet and Fibre Channel products, **allowing us to outperform versus expectations**…Over the past forty-five days we have launched an **unprecedented** number of OEM and ODM design wins for our Connectivity products, designed to meet the performance requirements of Grantley-based servers, with more to come.  We look forward to seeing these enterprise products ramp in the market over the coming year.

(emphasis added).

49.     Most recently, on January 29, 2015, the Company announced the following impressive results for the second quarter of 2015: Total revenue was $111 million, **above the high end of the initial guidance range**, aided by strong sequential and year-on-year growth in Gen 5 (16Gb) Fibre Channel products; non-GAAP diluted earnings of $0.24, up 14% year-on-year, and GAAP earnings of $0.06 as compared to a prior year loss of $0.05, **both above their respective initial guidance range**; and non-GAAP operating margin of 18%, up 130 basis points year-

- 13 -

AMENDED CLASS ACTION COMPLAINT

on-year and 560 basis points sequentially, with GAAP operating income of $8 million as compared to an operating loss of $2 million in the prior year and operating income of $1 million in the prior quarter.

50.   Commenting on the strong second quarter results, Individual Defendant Benck stated:

> The second quarter demonstrated continued progress with initiatives put in place at Emulex over the last 18 months, including the delivery of the broadest set of new Ethernet and Fibre Channel products in the Company's history, increased focus on execution, and a greater emphasis on fiscal discipline…Coupled with healthy demand for our Fibre Channel portfolio and share gains aided by accelerating adoption of our latest Gen 5 Fibre Channel products, **we again exceeded the high end of our initial revenue and earnings guidance.**

(emphasis added).

51.   In sum, Emulex showed significant signs of growth during the quarters preceding the completion of the Transaction, exceeding management's revenue and earnings guidance.   Despite the Company's strong financial prospects, the Board agreed to abruptly sell the Company at a price below its intrinsic value, to the detriment of Emulex's common stockholders.

## B. The Transaction Undervalued Emulex Shares

52.   On February 25, 2015, Emulex and Avago issued a joint press release announcing that they had entered into the Merger Agreement.

53.   The $8.00 per share Merger Consideration that Emulex's public stockholders received was insufficient, as it failed to adequately account for the Company's strong financial prospects and the tremendous benefits Avago will reap from the Merger.

54.   Indeed, analysts from *The Street*, a leading digital financial media company, recently reported that Emulex's strengths prior to the completion of the Transaction could be seen in multiple areas, such as its increase in net income, good

AMENDED CLASS ACTION COMPLAINT

cash flow from operations and growth in earnings per share. The article went on to state that the Company's net income growth for the second quarter compared to the same quarter the previous year had significantly exceeded that of the S&P 500 and the communications equipment industry. The Company's net income increased by 80.3% when compared to the same quarter one year prior. The article further stated that the Company's net operating cash flow has significantly increased by 319.52% to $20.85 million when compared to the same quarter last year. In addition, the Company vastly surpassed the industry average cash flow growth rate.

55. Another article published by investor news service Zacks on February 12, 2015 identified Emulex as a "company that looks well positioned for solid gain, but has been overlooked by investors lately." The article went on to state that "this Computer Networks stock has actually seen estimates rise over the past month for the current fiscal year by about 38.9%. But that is not yet reflected in its price, as the stock lost 9.6% over the same time frame."[3]

56. Further, analysts from DA. Davidson & Co., Piper Jaffray, and BMO Capital Markets had each issued price targets above the $8.00 per share Merger Consideration within the twelve months preceding the announcement of the Transaction; D.A. Davidson and Piper Jaffray had each issued price targets of $10.00 per share, 25% above the Merger Consideration.

57. And on September 16, 2013, Starboard Value LP ("Starboard"), one of Emulex's largest stockholders, conducted a detailed financial analysis of the Company and concluded that the Company was "extremely undervalued" when its shares were trading at approximately $7.85 per share, a mere 15 cents below the $8.00 per share Merger Consideration Emulex's stockholders ultimately received.

---

[3] *Should Emulex (ELX) Be On Your Radar Now?*, Zacks Equity Research (February 12, 2015), http://www.zacks.com/stock/news/164117/should-emulex-elx-be-on-your-radar-now (last visited Sept. 11, 2015).

AMENDED CLASS ACTION COMPLAINT

58.     Additionally, Avago stated that the Transaction will be immediately accretive to earnings per share on a non-GAAP basis, and that it expects Emulex businesses to contribute approximately $250 million to $300 million in annual net revenue with improved operating margins beginning in fiscal year 2016.

59.     In sum, Avago will capitalize on Emulex's significant prospects for future growth and profits, and has deprived the Company's stockholders of the ability to maintain equity in the post-Merger company without fairly compensating them for their Emulex shares.

## C. Activist Hedge Fund Stockholders Threaten to Remove Directors and Push for a Quick Sale of the Company

60.     The Emulex Board and management faced mounting pressure to sell the Company beginning in the fall of 2012, when Elliott acquired approximately 10% of the Company's outstanding shares.  Elliott acquired most of its Emulex shares at prices significantly below the $8.00 per share Merger Consideration.

61.     Elliott's reputation for pressuring boards to sell companies was undoubtedly well known to the Emulex Board.  In 2010 Elliott pushed Novell Inc. to sell itself, and in 2012 Elliott pressed BMC Software Inc. for several months to consider a sale, resulting in a $1 billion share buyback.  Elliott also previously amassed a stake in Brocade Communications Systems Inc., and a year later the company's CEO was forced to step down after trying to sell the company for more than two years.[4]

62.     Elliot used its influence as Emulex's largest stockholder to pressure the Company to add two of its hand-picked directors to the Board.  Caving to the

---

[4]     Serena Saitto, *Activist Investor Elliott Boosts Stake in Emulex to 11%*, Bloomberg Business (Dec. 14, 2012) http://www.bloomberg.com/news/articles/2012-12-14/activist-investor-increases-stake-in-emulex-to-11- (last visited Sept. 11, 2015).

AMENDED CLASS ACTION COMPLAINT

pressure, on March 27, 2013, the Board increased its size to 11 members and chose Eugene J. Frantz ("Frantz") and Individual Defendant Gregory S. Clark to fill the two vacancies that were created.  The Board appointed each of Messrs. Frantz and Clark to serve as members of the Nominating/Corporate Governance Committee of the Board.

63.    On March 27, 2013, the Company also entered into a letter agreement with Elliott.  Among other things, the letter agreement limited Elliott's ownership of Company common stock to 15%, and precluded Elliott proxy contest activities and proposals for the sale or merger of the Company until March 2014 generally, and until August 2013 for proxy contests and certain other transactions as set forth in the letter agreement. The letter agreement also restricted changes in the Company's Board committee structure as applicable to Messrs. Frantz or Clark.

64.    Clark and Frantz were both members of the Board throughout the Company's poorly run sale process,[5] and thus influenced the Board's decision making process.  As Elliott's hand-picked directors, Clark and Frantz undoubtedly sought to advance the interests of Elliott, which, for the reasons discussed below, were not aligned with the interests of Lead Plaintiff and Emulex's other public stockholders.

65.    On May 7, 2013, another activist hedge fund, Altai Capital, which owned approximately 5.4% of Emulex's common stock, sent a letter to Emulex's CEO, pressuring the Company to initiate a sale process and engage financial advisors immediately to undertake the process.  Altai Capital acquired most of its Emulex shares at prices significantly below the $8.00 per share Merger Consideration.  In the

---

[5]    Frantz did not stand for re-election at the Company's annual meeting on February 18, 2015, and thus did not vote to approve the Merger Agreement on February 25, 2015.  However, he maintained his seat on the Board through February 18, 2015, and thus served on the Board throughout nearly the entire sale process.

AMENDED CLASS ACTION COMPLAINT

letter, Altai Capital further stated that absent a sale of the entire Company, it would only be satisfied "**in the event of wholesale change at the Board level**," **and suggested replacing the Board members who had rejected Broadcom's $11 per share bid for Emulex and those who oversaw the Company's purchase of Endace**.[6]   Such Board members included Individual Defendants Bruce C. Edwards, Jeffrey W. Benck, Paul F. Folino, Beatriz V. Infante, Nersi Nazari, and Dean A. Yoost.  Thus, Altai Capital had put six of the ten directors that voted to approve the Transaction on notice that if they did not sell the Company, Altai Capital would seek to remove them from the Board.

66.    On September 16, 2013, Starboard, one of the largest stockholders of Emulex at the time, with a beneficial ownership of approximately 7.9% of the Company's outstanding common stock, sent a letter to Individual Defendant Benck and the Company's Board, stating that based on its extensive research and analysis, the Company was "extremely undervalued" when its shares were trading at approximately $7.85 per share.   Starboard acquired most of its Emulex shares at prices significantly below the $8.00 per share Merger Consideration.

67.    In the same letter, Starboard stated:

As a result of this historical track record, we believe that shareholders are skeptical of management's ability to properly allocate capital and manage expenses… While we recognize the Company has recently made a management change, it is unclear at this juncture whether the strategy going forward will be materially different from the past… **Also troubling is that the composition of the Board has remained stagnant with little change despite dismal performance.**  Apart from the addition of two new independent directors at the request of your

---

6    Press Release, Altai Capital Management, L.P., Altai Capital Management Delivers Letter to Emulex Coporation Outlining Recommendations for Potential Value Creation (May 7, 2013), *available at* http://www.businesswire.com/news/home/20130507006933/en/Altai-Capital-Management-Delivers-Letter-Emulex-Corporation#.VfBSSrmFOUk (last visited Sept. 11, 2015).

AMENDED CLASS ACTION COMPLAINT

largest shareholder earlier this year, **the remainder of the Board is composed primarily of long-time directors, who collectively have an average tenure on the Board of over 15 years.** Further, instead of implementing corporate governance best practices by having former CEOs step down from the Board upon their resignation as CEO, Emulex has made a terrible habit of allowing former CEOs to remain on the Board. In fact, the current Chairman is the former CEO, and the former Chairman, who remains on the Board, is a former CEO who served from 1993-2006… **It is time for a significant change at Emulex.** Specific changes must be made to address years of dismal operating and share price performance as well as sub-optimal corporate governance. **We believe a newly reconstituted Board comprised of independent directors** and shareholder advocates should be able to evaluate each of Emulex's businesses with a fresh perspective and determine the right strategy to enhance shareholder value.[7]

68.    Accordingly, just like Altai Capital, Starboard made it clear that it would actively seek to completely revamp the composition of the Board, and thus have certain of the Individual Defendants removed, if significant changes to the Company's operations were not implemented.

69.    In September 2013, Emulex announced that its Chief Financial Officer Michael J. Rockenbach ("Rockenbach") would resign at the end of the year. Rockenabach's resignation was driven by pressure from Elliott, Altai Capital, and Starboard.

70.    In November 2013, under pressure from Elliott, Emulex announced that its Executive Chairman and former CEO, James McCluney, would step down from his position and not seek re-election.

71.    Thus, by the fall of 2013, at least three of the Company's largest stockholders, each with significant financial resources and the ability to influence

---

[7]    Press Release, Starboard Value LP, Starboard Delivers Letter to Emulex CEO and Board of Directors (Sept. 16, 2013), *available at* http://www.prnewswire.com/news-releases/starboard-delivers-letter-to-emulex-ceo-and-board-of-directors-223943781.html (last visited Sept. 11, 2015).

AMENDED CLASS ACTION COMPLAINT

other stockholders, had sent a resoundingly clear message to the Board – they could either sell the Company, or face the embarrassment and stigma of losing their jobs for poor performance.

72.    But the interests of Elliott, Altai Capital and Starboard were not aligned with Emulex's other public stockholders because each of the firms acquired a significant portion of their Emulex shares below the $8.00 per share Merger Consideration, and their primary goal was to quickly return cash to their investors rather than invest in the Company long-term.  Hedge Funds such as Elliott, Altai Capital and Starboard are willing to liquidate their shares even in strong and viable companies because of their limited resources and the need to manage other portfolio firms.  Hedge funds also seek to avoid situations in which an entity is profitable, but requires ongoing monitoring and where growth opportunities and prospects for exit are not high enough to generate an attractive enough internal rate of return.  Such companies are routinely liquidated via sales to larger companies for cash, allowing hedge funds to quickly exit on their investment and turn their efforts and attention to new ventures.  Indeed, as one writer covering the industry wrote upon the news that Elliott had increased its stake in Emulex back in the fall and winter of 2012, "Elliott is Emulex's largest shareholder and, we surmise, will want to make a profit on that cash, a quick profit - a profit inside 12 months we'd say."[8]

**D. The Board Caves to Activist Investor Pressure and Decides to Quickly Sell the Company, Enabling Them to Avoid the Embarrassment of Losing Their Jobs**

73.    The pressure exerted on the Board by Elliott, Altai Capital and Starboard undoubtedly influenced the Company's strategic review process.  Indeed,

---

[8]    Chris Mellor, *Bolshy investor sinks teeth into weakened Emulex, tears off another chunk*, The Register (Dec. 14, 2012), http://www.theregister.co.uk/2012/12/14/emulex_elliott/ (last visited Sept. 11, 2015).

AMENDED CLASS ACTION COMPLAINT

Elliott had been able to exert its will to force certain Emulex officers and directors to resign and replace them with its own hand-picked directors, and the Board specifically authorized certain parties interested in acquiring Emulex to speak directly with representatives of Elliott.  Recommendation Statement at 16.  Further, according to its September 13, 2013 letter, representatives of Starboard were given access to Emulex's senior management in order to research the Company's value.

74.   Succumbing to the pressure exerted by Elliott, Altai Capital and Starboard, the Board retained Goldman Sachs to conduct a sale process in May 2013. *Id*. at 14.  Goldman Sachs had previously worked for Avago and received lucrative fees in connection with serving as an underwriter and co-manager in connection with Avago's initial public offering in 2009, and two secondary offerings in 2010. Goldman Sachs' prior relationship with Avago may have materially influenced Emulex's strategic review process and improperly tainted the sale process toward a deal with Avago.

75.   News that Emulex had hired a banker to sell the Company leaked to the public in July 2013.  Accordingly, prospective bidders were put on notice that the Board was eager to sell the Company, which undoubtedly impacted the value of the offers that were ultimately received.  Indeed, interested parties surely sensed that they could acquire Emulex at a discount given the pressure the Board faced to sell the Company.

76.   After purportedly suspending the sale process on a temporary basis in November 2013, the Board decided to recommence the process in or around May 2014.  *Id*. at 17.

77.   The sale process that purportedly occurred after the Board's May 20, 2014 meeting was poorly run and designed to finalize a sale of the Company as quickly as possible rather than maximize stockholder value or even obtain fair value for the Company.

- 21 -

AMENDED CLASS ACTION COMPLAINT

78.   After receiving two drastically inadequate proposals to acquire the Company from two private equity firms sometime between May and August 2014, the Board directed management to contact two operating companies, Avago and another unidentified company referred to in the Recommendation Statement as "Company A", to determine their interest in acquiring Emulex.  *Id.*

79.   Operating companies, as opposed to private equity firms, were much more likely to submit higher proposals to acquire the Company, because unlike private equity firms, they are able to obtain value in a merger as a result of obtaining significant synergies.  Yet, after recommencing the sale process, the Board initially only authorized Goldman Sachs and management to contact two operating companies, one of which was Avago.

80.   On August 23, 2014, a representative of Goldman Sachs contacted a representative of Avago to determine if Avago would be interested in exploring a strategic transaction involving Emulex.  *Id.*  On August 24, 2014, a representative of Avago expressed an interest in having a meeting to discuss Emulex's business.  *Id.* Emulex entered into a confidentiality agreement with Avago on August 28, 2014 and thereafter Emulex made nonpublic information available to Avago.  *Id.*

81.   Representatives of Emulex made presentations to representatives of Avago on September 4, 18 and 19, 2014 and continued to make nonpublic information regarding Emulex available to Avago, including internal financial forecasts prepared by management regarding the anticipated future financial and operating performance of Emulex for the years 2015 through 2017.  *Id.*   Individual Defendant Benck met with Avago's CEO to discuss Emulex and its business on September 18, 2014.  *Id.*  However, on September 30, 2014, representatives of Avago purportedly informed a representative of Emulex that it was not interested in further pursuing a potential strategic transaction involving Emulex at that time.  *Id.*

AMENDED CLASS ACTION COMPLAINT

82.   On October 29, 2014, a representative of Company A purportedly informed a representative of Emulex that it was not interested in pursuing a possible strategic transaction involving Emulex.  *Id.*

83.   On January 7, 2015, a representative of Avago contacted Individual Defendant Benck to discuss Avago's possible renewed interest in Emulex and set up a subsequent meeting on January 14, 2015.  *Id.* at 18.

84.   Individual Defendant Benck and another member of Company management attended the January 14 meeting, along with Avago's CEO and other representatives.  *Id.*   During the meeting, the Emulex representatives described progress in Emulex's business since the fall of 2014 and preliminary financial results for the first half of its current fiscal year.  *Id.*   The Emulex representatives also provided Avago with an updated revenue forecast for certain of Emulex's business segments.  *Id.*

85.   Thereafter, on January 26, 2015, Avago submitted a written proposal to acquire Emulex at a price of $7.50 per share in cash.  *Id.*   Avago indicated that it believed that it was in the interest of both Emulex and Avago that any transaction be **negotiated quickly**.  *Id.*   Accordingly, a representative of Avago informed Emulex that its proposal was subject to using the material terms of a merger agreement Avago had recently used in connection with another merger.  Avago also requested a 45-day period of exclusivity.  *Id.*

86.   At the Board meeting immediately after Avago submitted its proposal to acquire Emulex for $7.50 per share, held on January 31, 2015, Emulex management presented to the Board an updated financial forecast for the second half of fiscal years 2015 through 2019 (the "Revised Downward Forecast").  *Id.*   Emulex Management had previously prepared a financial forecast for fiscal years 2015 through 2017 in May 2014 (the "May 2014 Forecast").  *Id.* at 39.  **Yet, at or around the same time it**

AMENDED CLASS ACTION COMPLAINT

1   **received Emulex's $7.50 offer, Emulex management suddenly decided that it**
2   **needed to revise its May 2014 Forecast significantly downward**.

3        87.    Specifically, the May 2014 Forecast was revised downward with the
4   following changes:  while the May 2014 Forecast had projected revenues of $420.1
5   million and $437.7 million in fiscal years 2016 and 2017, respectively, the Revised
6   Downward Forecast projected revenues of  $401.6 million and $423.4 million in
7   fiscal years 2016 and 2017, respectively(*id*. at 39-40); while the May 2014 Forecast
8   had projected Non-GAAP net income of $49.6 million, $56.7 million and $61.7
9   million in fiscal years 2015 through 2017, respectively, the Revised Downward
10  Forecast projected Non-GAAP net income of  $48.5 million, $43.0 million and $54.5
11  million in fiscal  years 2015 through  2017, respectively, *id*.; and while the May 2014
12  Forecast had projected EBITDA of $76.3 million, $82.1 million and $87.6 million in
13  fiscal years 2015 through 2017, respectively, the Revised Downward Forecast
14  projected EBITDA of $74.4 million, $65.9 million, and $78.9 million in fiscal years
15  2015 through 2017, respectively, *id*.

16       88.    Further, while the Revised Downward Forecast contained unlevered
17  free cash flow projections, the Recommendation Statement curiously omitted the
18  unlevered free cash flow projections from the May 2014.  *Id*.  Accordingly, Emulex's
19  stockholders were deprived of the ability to determine how management's downward
20  revisions to the Company's financial projections impacted the Company's projected
21  unlevered free cash flows.

22       89.    The downward adjustments to management's projections had a
23  significant negative impact on the Company's valuation and the implied values per
24  share Goldman Sachs calculated in connection with the various financial analyses it
25  performed to support its fairness opinion.

26       90.    It is currently unclear if management's decision to suddenly revise the
27  projections from the May 2014 Forecast drastically downward, which was made

28

around the same time it received Avago's offer, was warranted by the Company's actual business performance and prospects, or a desire to make Avago's offers appear more fair to the Company's stockholders.

91.  The Board met on January 31, 2015 to review Avago's January 26th offer to acquire Emulex for $7.50 per share.  *Id*. at 18.  Representatives of Goldman Sachs participated in the meeting.  *Id*.  The representatives of Goldman Sachs reviewed Goldman Sachs' preliminary observations regarding Avago's proposal and made a presentation including a preliminary financial analyses of the proposal.  *Id*.

92.  The Board determined that management should continue discussions with representatives of Avago, and purportedly directed Individual Defendant Benck to continue to work closely with the Chairman of the Board to determine the best negotiating approach.  *Id*.  While the Board did not determine whether to accept exclusivity as a condition to proceeding with discussions with Avago at the January 31st meeting, management was directed to leave the possibility open.  *Id*.

93.  During the course of the next week, Benck purportedly conducted price discussions with a representative of Avago, during which Beck initially proposed a price of $8.50 in cash per share, to which the Avago representative responded with their final $8.00 per share offer on February 5, 2015.  *Id*. at 19.

94.  Avago continued to demand that the parties finalize the Transaction as quickly as possible.  *Id*.  Avago's February 5th proposal reiterated the request for exclusivity and the condition that a transaction be based on the merger agreement Avago had used in connection with a recent merger in order to finalize an agreement quickly.  *Id*.  Specifically, a representative of Avago advised Individual Defendant Benck that Avago's proposal was based on the expectation that a definitive agreement **would be executed by late February** to facilitate an announcement in conjunction with Avago's first quarter earnings.  *Id*.  Representatives of Avago also stated that if the parties were unable to execute a merger agreement prior to Avago's

- 25 -

AMENDED CLASS ACTION COMPLAINT

1   release of first quarter earnings, the deal would likely fall apart and Avago would turn
2   its attention to other projects. *Id*.

3      95.    On February 7, 2015, the Board, along with representative of Goldman
4   Sachs, met to consider Avago's most recent proposal. *Id*. The Board purportedly
5   determined that private equity firms would not be able to submit a competitive bid.
6   *Id*. The Board then purportedly reviewed four possible additional strategic bidders,
7   referred to in the Recommendation Statement as "Company A", "Company B",
8   "Company C", and "Company D". *Id*. The Board quickly dismissed each of the four
9   candidates, and determined that none of them were worth even contacting. *Id*.
10  Simply put, the Board sensed a deal with Avago could be finalized quickly, and was
11  prepared to get the deal done without so much as bothering to contact any other
12  strategic bidders. *Id*. The Board then directed Emulex management to finalize
13  discussions with Avago and gave management permission to enter into a 30-day
14  exclusivity agreement. *Id*.

15     96.    However, on February 10, 2015, Avago suddenly dropped its request for
16  exclusivity. *Id*. Sometime between February 10 and February 20, representatives of
17  Goldman Sachs purportedly contacted two of the strategic bidders that they had just
18  three days earlier purportedly determined were not viable merger candidates,
19  Company B and Company D. *Id*. at 20. Company B had purportedly initially agreed
20  to consider the possibility of acquiring Emulex, but then ultimately stated that it
21  would not be able to consider the matter at the present time. *Id*. Company D also
22  purportedly told Goldman Sachs that it was still considering the matter. *Id*.

23     97.    Eager to finalize a deal with Avago within the tight time constrains
24  Avago had set, the representatives of Company B and Company D were likely
25  advised by either Goldman Sachs or Emulex that the timeframe they would have to
26  complete diligence and submit a bid was tight. Given that Company B and Company
27  D were first contacted sometime on or after February 10, 2015, and that the Board

28
- 26 -
AMENDED CLASS ACTION COMPLAINT

1   voted to approve the Transaction on February 25, 2015, the Board's decision to allow

2   Goldman Sachs to contact Company B and Company D was likely driven more by a

3   desire to create the false impression that an adequate sale process had been

4   conducted, rather than actually eliciting bids from them.  Indeed, no reasonable

5   company could complete the diligence necessary to submit a bid within such a tight

6   and unreasonably short time frame.

7        98.   On February 17, 2015, Individual Defendant Benck informed the Board

8   that Avago's CEO had requested a meeting with him on February 20, 2015.  *Id*.  The

9   Board authorized Benck to attend.  *Id*.

10        99.   On February 21, 2015, the Board was informed that Avago would

11   require each of them and Emulex's named executive officers to sign a tender and

12   support agreement in which they would agree to tender their shares not to solicit

13   alternative transactions.  *Id*.

14        100.   Also on February 21, 2015, Benck advised the Board that he had met

15   with Avago's CEO on February 20, and that during their meeting, they discussed the

16   possibility of Benck continuing as manager of the Emulex business unit within Avago

17   once the parties finalized the deal.  *Id*. at 21.  It is currently unknown whether Benck

18   maintained a position with Avago after the Transaction closed, but the opportunity to

19   do so clearly created a conflict of interest.

20        101.   During the February 21 Board meeting, a representative of Goldman

21   Sachs led an extensive discussion of its analysis of the Transaction from a financial

22   point of view, which included reviewing various analyses Goldman Sachs had

23   performed concerning the fairness of the $8.00 per share Merger Consideration.  *Id*.

24   The Goldman Sachs representative also specifically touted the premiums the $8.00

25   Merger Consideration represented compared to Emulex's closing trading price the

26   previous day and to Emulex's 90-day trading average price.  *Id*.

27

28

- 27 -

AMENDED CLASS ACTION COMPLAINT

1    102.   The Board then determined that Emulex should seek to finalize the
2    Merger Agreement, despite the fact that Company D had stated that it was still
3    considering submitting a bid. *Id*.

4    103.   On February 25, 2015, the Board held a special meeting to vote on the
5    Merger Agreement and approve the Transaction. *Id*.  During the meeting, Goldman
6    Sachs informed the Board that a representative of Company D had purportedly
7    informed Goldman Sachs that it was not interested in pursuing a strategic transaction
8    with Emulex. *Id*. at 22.   Representatives of Goldman Sachs then provided their
9    analysis of the Transaction.   *Id*.   At the conclusion of the presentation made by
10   Goldman Sachs, which included several analyses concerning the fairness of the
11   Merger Consideration including a "Precedent Transactions Analysis" or "Premium
12   Analysis" slide entitled *Selected Semiconductor Transactions*, a Goldman Sachs
13   representative presented its oral opinion that the $8.00 per share Merger
14   Consideration was fair to Emulex's stockholders. *See id*.  The Board then voted to
15   approve the Merger Agreement. *Id*.

16   104.   In sum, caving to activist hedge fund investor pressure, the Board
17   oversaw a poorly run sale process between May 2014 and February 2015, during
18   which the goal was to sell the Company to the first bidder that presented anything
19   close to a justifiably acceptable bid.   Indeed**, only one other strategic company**
20   **besides Avago was even contacted prior to February 10, 2015**.

21   105.   The Board then purportedly authorized Goldman Sachs to contact two
22   other strategic parties sometime between February 10, 2015 and February 21, 2015,
23   but by that time Avago had already conducted significant diligence and submitted a
24   bid.   Thus, the purported overtures Goldman Sachs made to Company B and
25   Company D were nothing more than poorly veiled attempts to create the impression
26   that the Board had conducted some form of a legitimate sale process.  In reality, the
27   Individual Defendants were eager to finalize a deal with Avago as quickly as

28
- 28 -
AMENDED CLASS ACTION COMPLAINT

1    possible, enabling them to appease the activist hedge-fund investors and end their

2    tenures with the Company cleanly.

3        **E. The Individual Defendants Reap Personal Financial Gain From the**

4        **Transaction**

5        106.    Beginning in May 2014, approximately the same time the Board decided

6    to recommence the sale process and thus realized that a sale of the Company for some

7    premium to the then-current stock price was imminent, certain of the Individual

8    Defendants began to acquire significant amounts of Emulex common stock at prices

9    well below the $8.00 per share Merger Consideration.

10       107.    On May 6, 2014, Individual Defendant Daichendt purchased 200,000

11   Emulex common shares at a price of $4.70 per share.[9]    Prior to that date, Daichendt

12   had only owned 27,100 Emulex common shares, and he thus significantly increased

13   his ownership stake in the Company.

14       108.    On May 6, 2014, Individual Defendant Edwards purchased 10,000

15   Emulex common shares at a price of $4.67 per share, and 10,000 Emulex common

16   shares at a price of $4.68 per share.[10]    Prior to that date, Edwards had only owned

17   92,360 Emulex common shares, and he thus increased his ownership stake by

18   approximately 22%.

19       109.    On May 7, 2014, Individual Defendant Yoost purchased 8,282 Emulex

20   common shares at a purchase price of $5.00 per share.[11]    Prior to that date, Yoost had

21   ───────────────

22   9       Emulex Corp., Statement of Changes in Beneficial Ownership (Form 4) (May

23   6, 2014),  http://www.sec.gov/Archives/edgar/data/350917/000119529314000004/
     xslF345X03/edgardoc.xml (last visited Sept. 11, 2015).

24   10      Emulex Corp., Statement of Changes in Beneficial Ownership (Form 4) (May

25   6, 2014),  http://www.sec.gov/Archives/edgar/data/350917/000119529314000002/
     xslF345X03/edgardoc.xml (last visited Sept. 11, 2015).

26   11      Emulex Corp., Statement of Changes in Beneficial Ownership (Form 4) (May

27   8, 2014), http://www.sec.gov/Archives/edgar/data/350917/000133715614000004/
     xslF345X03/edgardoc.xml (last visited Sept. 11, 2015).

28

AMENDED CLASS ACTION COMPLAINT

owned approximately 91,000 Emulex common shares, and he thus increased his ownership stake by approximately 9%.

110.   Accordingly, Individual Defendants Daichendt, Yoost and Edwards each increased their ownership stakes in the Company at a time when they knew a deal was forthcoming and thus would be able to obtain a quick premium on their investment.

111.   Further, each of the Individual Defendants will receive significant amounts of compensation as a result of the Transaction by virtue of receiving the Merger Consideration in exchange for their Emulex shares.

112.   Individual Defendant Benck, who assumed primary responsibility for leading the sale process and engaging in negotiations with Avago, will receive total consideration of $5,653,623 as a result of the Emulex stock he owned upon the closing of the Transaction. *Id*. at 5.

113.   Benck was also eligible to receive a change in control payment of $6,374,944 if his employment was terminated upon the closing of the Transaction. *Id*. at 9.

114.   Individual Defendant Clark will receive total consideration of $394,592 as a result of the Transaction. *Id*. at 6.

115.   Individual Defendant Daichendt will receive total consideration of $1,866,800 as a result of the Transaction. *Id*.

116.   Individual Defendant Edwards will receive $900,880 in total consideration as a result of the Transaction. *Id*.

117.   Individual Defendant Folino will receive $268,256 in total consideration as a result of the Transaction. *Id*.

118.   Individual Defendant Infante will receive $444,120 in total consideration as a result of the Transaction. *Id*.

- 30 -

AMENDED CLASS ACTION COMPLAINT

119.   Individual Defendant Kelley will receive $266,800 in total consideration as a result of the Transaction.  *Id*.

120.   Individual Defendant Merchant will receive $266,800 in total consideration as a result of the Transaction.  *Id*.

121.   Individual Defendant Nazari will receive $543,472 in total consideration as a result of the Transaction.  *Id*.

122.   Individual Defendant Yoost will receive $848,104 in total consideration as a result of the transaction.  *Id*.

123.   In total, the named Individual Defendants, as well as certain Company executive officers, will receive $17,200,823 in total consideration as a result of the Transaction.  *Id*.

124.   In sum, certain of the Individual Defendants purchased significant amounts of Emulex common stock at prices well below the Merger Consideration during the months preceding the announcement of the Transaction, knowing that a sale of the Company was imminent and that they would be able to obtain a quick, easy premium on their investment within a few months' time.

125.   And each of the Individual Defendants received significant payouts by virtue of their otherwise illiquid Emulex shares being exchanged for the Merger Consideration.   The Individual Defendants were happy to accept the Merger Consideration because it provided them with a graceful exit from the Company with cold, hard cash.

126.   Thus, the Individual Defendants, recognizing that their only options were to quickly sell the Company or lose their Board seats, were each able to personally profit from the Transaction.

AMENDED CLASS ACTION COMPLAINT

**F.  The Preclusive Deal Protection Devices Deterred Superior Offers**

127.   After caving to pressure from activist hedge fund investors to quickly sell the Company, and in order to ensure that the consummation of the Transaction was not derailed, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operated conjunctively to lock-up the Transaction and ensured that no competing offers for the Company would emerge.

128.   First, the Merger Agreement's no solicitation provision prohibited the Company or the Individual Defendants from taking any affirmative action to obtain a better offer for the Company's stockholders.  Specifically, Section 5.3 of the Merger Agreement prohibited the Company and the Individual Defendants from soliciting, initiating, encouraging or facilitating any alternative acquisition proposal.

129.   Furthermore, Section 5.3 of the Merger Agreement granted Avago recurring and unlimited matching rights, which provided Avago with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it could use to prepare a matching bid; and (ii) four business days to negotiate with Emulex, amend the terms of the Merger Agreement, and make a counter-offer in the event a superior offer was received.

130.   The no solicitation and matching rights provisions essentially ensured that a superior bidder did not emerge, as any potential suitor was undoubtedly deterred from expending the time, cost, and effort of making a superior proposal while knowing that Emulex could easily foreclose a competing bid.  As a result, these provisions unreasonably favored Avago, to the detriment of the Class.

131.   Additionally, Section 7.2 of the Merger Agreement provided that Emulex must pay Avago a termination fee of $19.5 million in the event the Company elected to terminate the Merger Agreement to pursue a superior proposal.  The termination fee, which amounted to an unreasonably high 3.2% of the Transaction's equity value, further deterred other potential suitors from making a superior offer for

AMENDED CLASS ACTION COMPLAINT

the Company, as any competing bidder would have had to pay a naked premium for the right to provide Emulex's stockholders with a superior offer.

132. Ultimately, these deal protection provisions restrained the Board's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

## G. The Board Intentionally Omits a Critical Financial Analysis From the Recommendation Statement, Rendering  Certain Statements Materially Misleading

133. The Individual Defendants, having finalized a deal with Avago that would allow them to still reap personal financial gain and leave their positions gracefully rather than suffer the embarrassment of losing their jobs for poor performance amidst continued pressure from the activist hedge-fund investors, were eager to ensure the Transaction was successfully consummated.

134. Indeed, each of the Individual Defendants received sizeable aggregate payments in exchange for their Emulex shares, and Individual Defendant Benck was also involved in discussions with Avago to keep his lucrative job with the Company after the Transaction closed.

135. Accordingly, on April 7, 2015, the Board caused the Recommendation Statement to be filed with the SEC, which stated that the Board "unanimously (1) determined that the transactions contemplated by the Merger Agreement, including the [Tender] Offer and the Merger, are fair to, and in the best interests of, Emulex and its shareholders, (2) approved and declared advisable the Merger Agreement and the Transaction, including the Offer and the Merger, and (3) recommended that Shareholders accept the Offer, tender their Shares to Purchaser in the Offer and, to the extent applicable, approve and adopt the Merger Agreement and the Merger." *Id*. at 14.

136.   The Board undoubtedly presumed that its recommendation, along with Goldman Sachs' fairness opinion and the financial analyses it performed to support its opinion, would convince Emulex's stockholder to tender their shares, thereby ensuring that the Transaction would be consummated as planned.

137.   There was one significant problem however – one of the financial analyses Goldman Sachs performed in reviewing the fairness of the Merger Consideration, commonly referred to as a "Precedent Transactions Analysis" or "Premium Analysis",[12] showed that, contrary to the Board's publicly stated determination, the Merger Consideration was drastically inadequate and fundamentally unfair to Emulex's stockholders.

138.   Specifically, Goldman Sachs had performed a valuation analysis, entitled "Selected Semiconductor Transactions", whereby it selected certain transactions in the industry it deemed most similar to the Transaction and reviewed the respective premiums stockholders received in those transactions compared to the target company's undisturbed stock price and 52 week high stock price.  *See* Exhibit A at ELX91.

139.   Goldman Sachs' Selected Semiconductor Transactions Analysis, which appeared in the presentation it made to the Board on February  25, 2015, the date the Board approved the Transaction, is depicted below:

---

[12]     Such an analysis is one of "[t]he most common and accepted techniques" upon which a fairness opinion can rest.  Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1574 (2006).

AMENDED CLASS ACTION COMPLAINT

**Goldman Sachs**

## Selected Semiconductor Transactions

HIGHLY CONFIDENTIAL

INVESTMENT BANKING
DIVISION

($ in millions)

| Announce Date | Acquirer | Target | Equity Consideration[1] | Enterprise Value | Premium Over Undisturbed[2] | Premium Over 52-Wk High | Target's 1-Year Forward Multiple[3] | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Revenue | Net Income |
| **2014** | | | | | | | | |
| 10/14/2014 | Qualcomm | CSR | $ 2,500 | $ 2,190 | 56.5 % | 11.6 % | 2.7 x | 25.7 x |
| 8/22/2014 | Murata | Peregrine | 469 | 471 | 62.5 | 7.4 | 2.6 | NM |
| 8/20/2014 | Infineon | International Rectifier | 3,019 | 2,400 | 50.6 | 38.3 | 2.0 | 26.5 |
| 6/23/2014 | Avago | PLX Technology | 309 | 293 | 9.4 | (4.8) | 2.5 | 23.8 |
| 6/16/2014 | SanDisk | Fusion-IO | 1,274 | 1,100 | 21.2 | (27.0) | 2.5 | NM |
| 6/9/2014 | Analog | Hittite Microwave | 2,456 | 1,974 | 34.7 | NA | 6.2 | 29.4 |
| 2/10/2014 | Microchip | Supertex | 389 | 246 | 23.4 | 21.6 | 3.3 | 42.0 |
| 4/29/2014 | Cirrus Logic | Wolfson | 488 | 467 | 77.4 | NA | 2.5 | 99.0 |
| Mean | | | | | 42.0 % | 8.0 % | 3.0 x | 41.1 x |
| Median | | | | | 42.6 | 9.5 | 2.6 | 27.9 |
| **2013** | | | | | | | | |
| 12/16/2013 | Avago | LSI | 7,020 | 6,355 | 48.9 | NA | 2.7 | 19.4 |
| 9/15/2013 | Maxim | Voltera | 633 | 478 | 55.4 | (10.5) | 3.2 | 31.5 |
| Mean / Median | | | | | 51.2 % | (10.5)% | 3.0 x | 25.4 x |
| **2012** | | | | | | | | |
| 7/27/2012 | Apple | AuthenTec | $ 393 | $ 374 | 57.8 % | 49.8 % | 4.4 x | 79.1 x |
| 5/2/2012 | Microchip | Standard Microsystems | 970 | 808 | 37.9 | 31.0 | 1.9 | 24.8 |
| Mean / Median | | | | | 47.8 % | 40.4 % | 3.2 x | 51.9 x |
| **2011** | | | | | | | | |
| 5/26/2011 | Skyworks | Advanced Analogic Tech | $ 295 | $ 181 | 51.0 % | 22.4 % | 1.9 x | 73.5 x |
| 7/20/2011 | Microsemi | Zarlink | 601 | 460 | 66.5 | 45.6 | 1.7 | 15.5 |
| 9/12/2011 | Broadcom | NetLogic | 3,912 | 3,693 | 56.7 | 14.4 | 7.4 | 27.8 |
| 4/4/2011 | Texas Instruments | National Semiconductor | 6,400 | 6,543 | 77.7 | 56.3 | 4.2 | 20.8 |
| 1/5/2011 | Qualcomm | Atheros | 3,697 | 3,241 | 21.6 | 2.5 | 3.0 | 20.6 |
| Mean | | | | | 54.7 % | 29.0 % | 3.6 x | 31.6 x |
| Median | | | | | 56.7 | 22.4 | 3.0 | 20.8 |
| | | | | | | | | |
| Mean | | | | | 44.8 % | 17.6 % | 3.0 x | 35.0 x |
| Median | | | | | 50.8 | 14.4 | 2.7 | 26.1 |

*Source: Press Releases and Bloomberg*
[1] *Represents fully diluted equity consideration at time of announcement as calculated with latest publicly available filings.*
[2] *Represents premium to closing price on date prior to first mention in publicly available news source.*
[3] *IBES 1 year forward estimates at the time of announcement.*

AMENDED CLASS ACTION COMPLAINT

140.   Goldman Sachs' Selected Semiconductor Transactions Analysis revealed that the mean and median premiums over the target company's undisturbed stock price for the selected transactions were **44.8%** and **50.8%,** respectively, and the mean and median premiums over the target company's 52 week high were **17.6%** and **14.4%,** respectively.

141.   Accordingly, Goldman Sachs' Selected Semiconductor Transactions Analysis clearly indicated that the corresponding premiums that Emulex's stockholders stood to receive, **26.4%** to the closing sales price the last trading day prior to the executing of the Merger Agreement (*i.e.* the undisturbed stock price) and **4.8%** based on the 52-week high closing share price, Recommendation Statement at 22-23, were significantly below the premiums stockholders had received in comparable transactions.

142.   Goldman Sachs' Selected Semiconductor Transactions Analysis was presented to the Board on February 25, 2015, the date it voted to approve the Transaction, in a presentation Goldman Sachs gave to the Board.

143.   On February 21, 2015, a representative of Goldman Sachs had also specifically led an extensive discussion with the Board concerning Goldman Sachs' analysis of the Transaction from a financial point of view based on the Merger Consideration of $8.00 in cash per share, during which the representative specifically discussed the premiums the Merger Consideration represented compared to Emulex's closing trading price on the most recent trading day and to Emulex's 90-day trading average price. *Id.* at 21.

144.   Because Goldman Sachs' Selected Semiconductor Transactions Analysis clearly showed that the premium Emulex's stockholders stood to receive in connection with the Transaction was significantly below the premiums obtained in comparable transactions, and that the Merger Consideration was therefore inadequate

- 36 -

AMENDED CLASS ACTION COMPLAINT

and unfair, the Board intentionally or recklessly omitted the analysis from the Recommendation Statement.

145.   Indeed, the Board decided to include in the Recommendation Statement another financial analysis performed by Goldman Sachs which appeared in the same section of the February 25 fairness presentation as the Selected Semiconductor Transactions Analysis.   Specifically, Goldman Sachs' Selected Public Trading Comparables Analysis, which is referred to in the Recommendation Statement as the "Selected Companies Analysis", *id.* at 27-28, appeared in the February 25 Fairness Presentation in same section where the Selected Semiconductor Transactions Analysis appeared. *See* Exhibit A at ELX87.

146.   Despite knowing that the premium Emulex's stockholders stood to receive in connection with the Transaction paled in comparison to the premiums stockholders of similar companies had received in connection with recently completed comparable transactions, the Board, via the Recommendation Statement, nonetheless continued to falsely and misleadingly tout that the premium was significant and supported the Board's recommendation that Emulex's stockholders tender their shares in the Tender Offer.  Recommendation Statement at 22-23.

147.   Specifically, the Recommendation Statement states that "**In** approving the Merger Agreement and the transactions contemplated thereby and **making its recommendation that Shareholders tender their Shares in the Offer**, the Board considered a number of factors, including the following, **which the Board believes support these determinations**:

Premium to Market Price:   **The Board considered that the Merger Consideration of $8.00 in cash per share represented**:

- **A premium of 26.4% to the closing sales price on February 24, 2015, the last trading day prior to the execution of the Merger Agreement**;

AMENDED CLASS ACTION COMPLAINT

- a premium of 24.0% based on the 30-day average of $6.45 per Share as of February 24, 2015;

- a premium of 32.9% based on the 90-day average of $6.02 per Share as of February 24, 2015;

- **a premium of 4.8% based on the 52-week high closing Share price of $7.63 per Share as of February 24, 2015**;

- a premium of 79.4% based on the 52-week low closing Share price of $4.46 per Share as of February 24, 2015; and

- a premium of 33.3% based on the Institutional Brokers' Estimate System ("IBES") median price target of $6.00 per Share on February 24, 2015.

*Id*. (emphasis added).

148. The Board's intentional decision to omit Goldman Sachs' Selected Semiconductor Transactions Analysis from the Recommendation Statement renders the above-referenced statement in the Recommendation Statement materially misleading because the above-referenced statements clearly create the impression that the premiums supported the fairness of the Merger Consideration, when in reality the premiums were materially below the premiums stockholders of similar companies have received in connection with recently completed comparable transactions.

149. Defendants knowingly, or at the very least recklessly, failed to disclose the material information from Goldman Sachs' Selected Semiconductor Transactions Analysis discussed above. The omission of the information from Goldman Sachs' Selected Semiconductor Transactions Analysis was material and rendered certain portions of the Recommendation Statement that touted the premium Emulex's stockholders received in connection with the Transaction materially misleading. As a result of this material omission and the misleading statements in the Recommendation Statement, Emulex's stockholders were unable to make an

- 38 -

AMENDED CLASS ACTION COMPLAINT

informed decision concerning whether or not to tender their shares, and suffered harm as a result.

## H. Defendants Knowingly or Recklessly Disregarded that the Recommendation Statement Omitted Material Information and Contained Materially False or Misleading Statements

150.   The Individual Defendants, and thus Emulex, knew or recklessly disregarded that the Recommendation Statement omitted any reference to or summary of Goldman Sachs' Selected Semiconductor Transactions Analysis, and contained the materially false and misleading statements referenced-above, which state, or at the very create a clear impression that the premium obtained in connection with the Transaction supported the fairness of the Merger Consideration to Emulex's stockholders.

151.   Specifically, Defendants undoubtedly reviewed the contents of the Recommendation Statement before it was filed with the SEC.  Indeed, Individual Defendant Benck has attested that he made due inquiry concerning the information set forth in the Recommendation Statement.  *Id*. at 48.  Individual Defendant Benck was thus aware that the Recommendation Statement omitted any reference to or summary of Goldman Sachs' Selected Semiconductor Transactions Analysis, and contained the materially false and misleading statements touting the premium Emulex's stockholders received in the Transaction, referenced-above.

152.   Further, the Recommendation Statement indicates that on February 21, 2015:

> A representative of Goldman Sachs then led **an extensive discussion** of Goldman Sachs' analysis of the possible transaction from a financial point of view based on the indicated price of $8.00 in cash per Share. He noted that Goldman Sachs' preliminary analysis, based on the work undertaken to date, on the factors and  assumptions described and on the forecasts of Emulex's management, indicated that the $8.00 in cash per Share was in excess of the standalone value of Emulex indicated in

- 39 -

AMENDED CLASS ACTION COMPLAINT

Goldman Sachs' analysis. He also noted that $8.00 in cash per Share represented a 25% premium to the closing trading price on February 19, 2015 and a 34% premium to the 90-day trading average price on February 19, 2015…

*Id.* at 21.

153.   The Recommendation Statement also indicates that on February 25, 2015 Goldman Sachs provided the Board with an analysis of the Transaction and presented its oral opinion that based upon and subject to the factors and assumptions set forth therein and reviewed at the meeting, the $8.00 per share Merger Consideration was fair from a financial point of view to Emulex's stockholders. *Id.* at 22.   The Recommendation Statement further indicates that the Board considered the various financial analyses presented by Goldman Sachs in connection with approving the Merger Agreement and making its recommendation that Emulex stockholders tender their shares in the Tender Offer. *Id.* at 23.

154.   Goldman Sachs' Selected Semiconductor Transactions Analysis specifically appeared in the presentation it made to the Board on February 25, 2015, the date the Board approved the Transaction.   Accordingly, each of the Individual Defendants undoubtedly saw and reviewed the Semiconductor Transactions Analysis on February 25, 2015, and likely at previous Board meetings during which Goldman Sachs made presentations.   The Individual Defendants thus knew, or recklessly disregarded the fact that the Recommendation Statement omitted any reference to or summary of Goldman Sachs' Selected Semiconductor Transactions Analysis, and contained the materially false and misleading statements touting the premium Emulex's stockholders received in the Transaction, referenced-above.

AMENDED CLASS ACTION COMPLAINT

### FIRST CAUSE OF ACTION
### Claim for Violations of Section 14(e) of the Exchange Act Against
### All Defendants

155.   Lead Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

156.   Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation."  15 U.S.C. § 78n(e).

157.   As discussed above, Emulex filed with the SEC and delivered the Recommendation Statement to its stockholders, which Defendants knew or recklessly disregarded contained material omissions and misstatements as set forth above.

158.   During the relevant time period, Defendants disseminated the false and misleading Recommendation Statement above.   Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

159.   The Recommendation Statement was prepared, reviewed and/or disseminated by Defendants.   It misrepresented and/or omitted material facts, including material information about the fairness of the consideration offered to Emulex stockholders via the Tender Offer.

160.   In so doing, Defendants made untrue statements of material facts and omitted material facts necessary to make the statements that were made not misleading in violation of Section 14(e) of the Exchange Act.  By virtue of their positions within the Company and/or roles in the process and in the preparation of the

- 41 -

Recommendation Statement, Defendants were aware of this information and their obligation to disclose this information in the Recommendation Statement.

161.   The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares or seek appraisal. In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to stockholders.

162.   Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and/or misleading.  Indeed, while Defendants undoubtedly had access to and reviewed the omitted material information in connection with approving the Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and misleading.

163.   The misrepresentations and omissions in the Recommendation Statement are material to Lead Plaintiff and the Class, and Lead Plaintiff and the Class were deprived of their entitlement to make a fully informed decision in connection with the Tender Offer, as such misrepresentations and omissions were not corrected prior to the expiration of the Tender Offer.

164.   As a direct and proximate result of the above-referenced material misstatements or omissions, Lead Plaintiff and the Class suffered significant damages.

165.   Accordingly, Defendants are liable for violating Section 14(e) of the Exchange Act.

166.   Lead Plaintiff and the Class are therefore entitled to recover an amount to be determined at trial.

AMENDED CLASS ACTION COMPLAINT

**SECOND CAUSE OF ACTION**
**Claim for Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 (17 C.F.R. § 240.14d-9) Against All Defendants**

167.   Lead Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

168.   Defendants caused the Recommendation Statement to be issued with the intention of soliciting stockholder support of the Transaction.

169.   Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers. Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

170.   SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof.

171.   In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's directors to:

> Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

AMENDED CLASS ACTION COMPLAINT

172.   The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above.   Moreover, Defendants knew or recklessly disregarded that the Recommendation Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

173.   Defendants knowingly or with deliberate recklessness allowed the material information identified above to be omitted from the Recommendation Statement, causing certain statements therein to be materially incomplete and misleading.   Indeed, while Defendants undoubtedly had access to and reviewed the omitted material information in connection with approving the Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and misleading.

174.   The misrepresentations and omissions in the Recommendation Statement are material to Lead Plaintiff and the Class, and Plaintiff and the Class were deprived of their entitlement to make a fully informed decision concerning the Tender Offer because such misrepresentations and omissions were not corrected prior to the expiration of the Tender Offer.

175.   As a direct and proximate result of the above-referenced material misstatements or omissions, Lead Plaintiff and the Class suffered significant damages.

176.   Accordingly, Defendants are liable for violating Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9.

177.   Lead Plaintiff and the Class are therefore entitled to recover an amount to be determined at trial.

AMENDED CLASS ACTION COMPLAINT

### THIRD CAUSE OF ACTION
### Claim for Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

178.   Lead Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

179.   The Individual Defendants acted as controlling persons of Emulex within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Emulex, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading.

180.   Each of the Individual Defendants were provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

181.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Recommendation Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Transaction.  They were, thus, directly involved in the making of this document.

182.   In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating,

AMENDED CLASS ACTION COMPLAINT

1   reviewing, and approving the Transaction.  The Recommendation Statement purports

2   to describe the various issues and information that the Individual Defendants

3   reviewed and considered.  The Individual Defendants participated in drafting and/or

4   gave their input on the content of those descriptions.

5       183.   By virtue of the foregoing, the Individual Defendants have violated

6   Section 20(a) of the Exchange Act.

7       184.   As set forth above, the Individual Defendants had the ability to exercise

8   control over and did control a person or persons who have each violated Sections

9   14(e) and 14(d)(4) of the Exchange Act and Rule 14d-9, by their acts and omissions

10  as alleged herein.  By virtue of their positions as controlling persons, the Individual

11  Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and

12  proximate result of Individual Defendants' conduct, Lead Plaintiff will be irreparably

13  harmed.

## **PRAYER FOR RELIEF**

14

15      WHEREFORE, Lead Plaintiff demands relief in his favor and in favor of the

16  Class and against Defendants as follows:

17      A.     Declaring that this action is properly maintainable as a Class action and

18  certifying Lead Plaintiff as Class representative;

19      B.     Rescinding, to the extent already implemented, the Transaction or any of

20  the terms thereof, or granting Lead Plaintiff and the Class rescissory damages;

21      C.     Directing the Individual Defendants to account to Lead Plaintiff and the

22  Class for all damages suffered as a result of the Individual Defendants' wrongdoing;

23      D.     Awarding Lead Plaintiff the costs and disbursements of this action,

24  including reasonable attorneys' and experts' fees; and

25      E.     Granting such other and further equitable relief as this Court may deem

26  just and proper.

27

28

AMENDED CLASS ACTION COMPLAINT

1   Dated:  September 11, 2015

2                                                    **FARUQI & FARUQI, LLP**

3                                                    /s/ *David E. Bower*
                                                     David E. Bower
4                                                    10866 Wilshire Boulevard, Suite 1470
                                                     Los Angeles, CA 90024
5                                                    Telephone: (424) 256-2884
                                                     Facsimile:  (424) 256-2885
6                                                    Email:  dbower@faruqilaw.com

7
                                                     *Attorneys for Lead Plaintiff and Lead*
8                                                    *Counsel for the Putative Class*

9
    **OF COUNSEL:**
10  **FARUQI & FARUQI, LLP**
    Juan E. Monteverde
11  Miles D. Schreiner
    369 Lexington Avenue, 10th Fl.
12  New York, NY 10017
    Tel.: (212) 983-9330
13  Fax: (212) 983-9331
    Email: jmonteverde@faruqilaw.com
14          mschreiner@faruqilaw.com

15  *Attorneys for Lead Plaintiff and*
    *Lead Counsel for the Putative Class*
16

17

18

19

20

21

22

23

24

25

26

27

28
                                       - 47 -
    AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 17, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I have e-mailed the foregoing document to the non-CM/ECF participants indicated on the Manual Notice List.

Dated: September 17, 2015                    /s/ David E. Bower
                                                              David E. Bower

---