JS-6

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **GARY VARJABEDIAN, on behalf of himself and all others similarly situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**EMULEX CORPORATION, et al.,**<br><br>**Defendants.** | **Case No.: SACV 15-00554-CJC(JCGx)**<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |

## I. INTRODUCTION

This is a putative securities class action brought by Plaintiff Gary Varjabedian against Defendants Emulex Corporation ("Emulex"), Emerald Merger Sub, Inc. ("Merger Sub"), Avago Technologies Wireless (U.S.A.) Manufacturing, Inc. ("Avago"), and ten

members of Emulex's Board and management (the "Individual Defendants") (collectively, "Defendants").[1] Avago acquired Emulex in 2015 after the two companies reached a merger agreement and Merger Sub initiated a tender offer for Emulex's outstanding stock. Emulex solicited a fairness opinion from its financial advisor, Goldman Sachs, who performed financial analyses and determined that the proposed merger, which produced a 26.4% premium over Emulex's stock price at the time, was fair to shareholders. Emulex subsequently issued a statement that summarized Goldman Sachs' findings and recommended that investors tender their shares. Emulex's statement did not mention a one-page chart Goldman Sachs had created which indicated that although Emulex's premium was within industry norms, it was also below-average. Plaintiff argues that by omitting the one-page chart from its summary of Goldman Sachs' fairness opinion, Emulex misled shareholders into believing the merger was a better deal than it actually was, in violation of federal securities laws. He brings claims under §§ 14 and 20 of the Exchange Act.

Defendants have moved to dismiss. They argue that Emulex's statements to its shareholders regarding whether they should tender their shares were not misleading, and that in any event, Plaintiff has failed to plead the required "strong inference of scienter," or that Defendants acted with "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Plaintiff responds that such an inference exists because the Recommendation Statement contradicts the Premium Analysis and because Defendants' omission of the Premium Analysis demonstrates their intent to mislead shareholders. The Court disagrees. Nothing in the Recommendation Statement contradicts the information in the Premium Analysis, and Defendants' decision to omit the Premium Analysis was not "highly

[1] Jeffrey W. Benck, Gregory S. Clark, Gary J. Daichendt, Bruce C. Edwards, Paul F. Folino, Beatriz V. Infante, John A. Kelley, Rahul N. Merchant, Nersi Nazari, and Dean A. Yoost.

unreasonable" or an "extreme departure from the standards of ordinary care" such that the Court could infer scienter from the omission alone. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). Accordingly, Plaintiff has failed to properly plead a strong inference of scienter, and Defendants' motion is GRANTED.

## II. BACKGROUND

Emulex was a Delaware corporation with its headquarters in Costa Mesa, California, that provided converged networking solutions centers and sold storage adapters, network interface cards, and other products. (Dkt. 29 ["First Amended Complaint" ("FAC")] ¶ 14.) On February 25, 2015, Emulex and Avago, another technology company, issued a joint press release announcing that they had entered into a merger agreement, with Avago offering to pay $8.00 for every share of outstanding Emulex stock. (*Id.* ¶¶ 52–53.) The $8.00 price was a premium of 26.4% on Emulex's stock price the day before the merger was announced. (*Id.* ¶ 7.) Pursuant to the terms of the announced agreement, a subsidiary of Avago, Merger Sub, initiated a tender offer for Emulex's outstanding stock on April 7, 2015. (*Id.* ¶¶ 4–5.) The tender offer expired on May 5, 2015, and Merger Sub merged into Emulex, with Emulex surviving as a wholly owned subsidiary of Avago. (*Id.* ¶ 4.)

Prior to the consummation of the merger, Emulex retained its financial advisor, Goldman Sachs, to determine whether the proposed merger agreement would be fair to shareholders from a financial point of view. Goldman Sachs determined that it would be, and provided Emulex with a number of financial analyses justifying its position. Based in part on Goldman Sachs' opinion, on April 7, 2015, the day that Merger Sub initiated the tender offer, Emulex filed a 48-page Recommendation Statement with the Securities and Exchange Commission ("SEC") on Schedule 14D-9. (*See* Dkt. 31 Exh. A

[“Recommendation Statement”] at 25.)[2] The Recommendation Statement supported the tender offer and recommended that shareholders tender their shares. It listed nine reasons for that recommendation: (1) that the value shareholders would receive in the merger “was greater than could be reasonably expected” in the future if they continued to hold Emulex stock; (2) that other available alternatives and transactions were less favorable; (3) that Emulex shareholders would receive a premium on their stock, (4) that Goldman Sachs found that the merger was fair; (5) that the cash consideration shareholders would receive was certain; (6) that the agreement provided that Emulex could back out if it received a better offer before closing; (7) that the agreement permitted Emulex to modify its recommendation; (8) that a termination fee built into the merger agreement would not preclude subsequent third party offers for Emulex; and (9) that closing conditions were appropriate. (Recommendation Statement at 22–23.)

The Recommendation Statement also included a five-page summary of Goldman Sachs’ fairness opinion. The summary describes in some detail the processes Goldman Sachs followed when rendering its opinion, and relates how four particular financial analyses—the Historical Stock Trading Analysis, the Selected Companies Analysis, the Illustrative Present Value of Future Share Price Analysis, and the Illustrative Discounted Cash Flow Analysis—supported Goldman Sachs’ opinion that the merger was fair to shareholders. (Recommendation Statement at 27–29.)

Among the other financial analyses Goldman Sachs produced for Defendants was a one-page chart called “Selected Semiconductor Transactions,” and which the parties refer to as the “Premium Analysis.” (*See* FAC at p. 35.) The Premium Analysis “selected certain transactions in the industry” that Goldman Sachs deemed most similar to the

---

[2] Defendants’ request for judicial notice is GRANTED. Public SEC filings are properly subject to judicial notice and, in any event, the Recommendation Statement is incorporated by the FAC. *See U.S. v. Ritchie*, 342 F.3d 903, 908–09 (9th Cir. 2003).

proposed merger between Avago and Emulex, and "reviewed the respective premiums stockholders received in those transactions compared to" the premium Emulex's stockholders were due to receive. (FAC ¶¶ 137–38.) Altogether the Premium Analysis collected 17 transactions involving a semiconductor company between 2010 and 2014. Comparing Emulex's premium—26.4%—with the premiums listed in the Premium Analysis indicates that although Emulex's premium fell within the normal range of semiconductor merger premiums, it was below-average. (*Id.* at p. 35.) Goldman Sachs' opinion was that the merger was fair despite a below-average premium, and Defendants elected not to summarize the one-page Premium Analysis in the fairness opinion summary they included in the Recommendation Statement. Plaintiff alleges that this failure violates the federal securities laws.

One day after the Recommendation Statement was published, Plaintiff filed his original complaint. After obtaining limited expedited discovery, Plaintiff filed his FAC on September 17, 2015, alleging violations of §§ 14 an 20 of the Exchange Act. (*See generally* FAC.) Defendants moved to dismiss for failure to state a claim on October 13, 2015. (Dkt. 30.)

## III. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. The issue on a motion to dismiss for failure to state a claim is not whether the claimant will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). When evaluating a Rule 12(b)(6) motion, the district court must accept all material allegations in the complaint as true and

construe them in the light most favorable to the non-moving party. *Moyo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir. 1994). The district court may also consider additional facts in materials that the district court may take judicial notice, *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994), as well as "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading," *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled in part on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (stating that while a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, courts "are not bound to accept as true a legal conclusion couched as a factual allegation" (citations and quotes omitted)). Dismissal of a complaint for failure to state a claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. In keeping with this liberal pleading standard, the district court should grant the plaintiff leave to amend if the complaint can possibly be cured by additional factual allegations. *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

## IV. ANALYSIS

### A. Section 14(e) Cause of Action

Plaintiff's first cause of action is for violations of § 14(e) of the Exchange Act, which makes it unlawful to "make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer." 15 U.S.C. § 78n(e). Defendants move to dismiss Plaintiff's § 14(e) cause

of action on the ground that Plaintiff has failed to allege that Defendants acted with the scienter necessary to state a claim under § 14(e).[3]

The parties dispute whether Plaintiff is required to plead that Defendants acted with scienter to allege a claim under § 14(e). "[E]ven though the Ninth Circuit has not decided the issue regarding the scienter required under section 14(e), the majority of other circuits and districts to address the issue have held that . . . scienter [is] required under section 14(e)[.]" *Rubke v. Capitol Bancorp Ltd.*, 460 F. Supp. 2d 1124, 1150 (N.D. Cal. 2006) (collecting cases); *see also Dixon v. Cost Plus*, Case No. 12-CV-02721-LHK, 2012 WL 2499931, at *6 (N.D. Cal. June 27, 2012) ("Under Section 14(e) of the Securities and Exchange Act, Plaintiff must show that Defendants made a material misrepresentation or omission with scienter in connection with a tender offer.") The courts that have concluded that § 14(e) claims require a showing of scienter have generally reasoned as follows: § 14(e) is "modeled on the antifraud provisions of § 10(b) of the ['34] Act and Rule 10b-5," *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 10 (1985), and those provisions require proof of scienter, *Ernst & Ernst v. Hochfelder*, 425 U.S. at 193, so § 14(e) claims should also require scienter.

The parallels between the two provisions are obvious: Rule 10b-5 prohibits individuals from, in certain circumstances, "mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 CFR 240.10b-5. Section 14(e) uses identical language. 15 U.S.C. § 78n(e). Courts have looked to this parallel to hold unanimously that § 14(e) claims require proof of scienter. *See, e.g., In re Digital Island Sec. Litig.*, 357 F.3d 322, 328 (3d Cir. 2004) ("We . . . join

---

[3] Defendants also move to dismiss the FAC on the ground that the Premium Analysis was not material. *See* § 14(e) (making it unlawful to "omit to state any *material* fact necessary. . .). Because the Court is disposing with this action on the ground that Plaintiff has not pleaded scienter, there is no need to reach the question of whether he has properly pleaded materiality.

those circuits that hold that scienter is an element of a Section 14(e) claim . . . [b]ecause of the similarity in the language and scope of Section 14(e) and Rule 10b-5”); *Flaherty v. Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (“The elements of a claim under Section 14(e), which applies to tender offers, are identical to the Section 10(b)/Rule 10b-5 elements,” including scienter.); *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 431 (6th Cir. 1980) (“Congress envisioned scienter to be an element of 14(e).”).

Plaintiff contends that he should not have to allege scienter for his § 14(e) claim—only negligence—and that those courts that have concluded that § 14(e) claims require proof of scienter have erred. To support this position, Plaintiff constructs an elaborate argument involving the stated legislative purpose of section 14(e), analogies to other federal securities laws, and citations to the academic literature. (See Dkt. 38 at 10–15.) In its essence, the argument goes like this: § 14(e) contains two clauses, one of which is patterned after Rule 10b-5 (which requires scienter), and one of which is patterned after § 17(a)(2), (which does not, see *Aaron v. SEC*, 446 U.S. 680, 701 (1980)). Accordingly—Plaintiff argues—claims brought under the § 14(e) clause resembling § 17(a)(2) should not require a showing of scienter. Finally, Plaintiff asserts that reading § 14(e) to *not* require scienter is consistent with the statute’s legislative intent—to ensure that stockholders have adequate information when responding to a tender offer.

This argument is not entirely without merit, but Plaintiff has cited no case law adopting his novel view of § 14(e). So far as Plaintiff has alleged, and so far as the Court can determine, *no* federal court has held that § 14(e) requires only a showing of negligence. Considering the wealth of persuasive case law to the contrary, the Court concludes that the better view is that the similarities between Rule 10b-5 and § 14(e) require a plaintiff bringing a cause of action under § 14(e) to allege scienter.

To adequately demonstrate that a defendant acted with scienter in a securities fraud case, "a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners*, 552 F.3d at 991.[4] Importantly, the standard for pleading scienter in the context of securities fraud is atypical. Rather than simply allege some facts that plausibly suggest scienter, the Private Securities Litigation Reform Act ("PSLRA") requires Plaintiff to satisfy an unusually high standard: he must "plead facts evincing a *strong inference* of scienter in order to survive a motion to dismiss." *Gompper v. Visx, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002) (emphasis added). The Ninth Circuit has explained that this requirement is designed to "eliminate abusive and opportunistic securities litigation and to put an end to the practice of pleading fraud by hindsight." *Id.* at 897. When determining whether a plaintiff has met the strong inference standard, the district court "must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to plaintiffs." *Id.* at 897. Plaintiff's allegations regarding scienter can survive Defendants' motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the alleged facts." *Biotechnology Value Fund, LP v. Celera Corp.*, 12 F. Supp. 3d 1194, 1200–01 (N.D. Cal. Dec. 20, 2013). In other words, the Supreme Court has explained, "[t]he reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 308, 326 (2007).

In the Ninth Circuit, district courts employ a "dual inquiry" to determine whether a plaintiff has pleaded a strong inference of scienter. *Zucco Partners*, 552 F.3d at 992.

---

[4] Plaintiff is required to allege both falsity and scienter. The Ninth Circuit has noted that allegations of falsity and scienter "involve the same set of facts" and so "can be collapsed into a single inquiry." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 932 (9th Cir. 2003). Accordingly, this order considers falsity and scienter together.

First, the court "determine[s] whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter." *Id.* The Ninth Circuit has described this step as "segmented" and noted that Supreme Court has "call[ed] into question" whether an analysis that "relies exclusively on a segmented analysis of scienter" is sufficient. *Id.* at 991. Accordingly, "if no individual allegations are sufficient," the court proceeds to the second step and conducts a "holistic review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.* at 992.

Plaintiff argues that he has alleged a strong inference of scienter in at least three different ways. First, he says, Defendants made misleading statements regarding Emulex premiums despite having access to contradictory information—namely, the Premium Analysis. Second, Plaintiff argues that Defendants knew of the Premium Analysis and failed to reveal it to investors, knowing that keeping the information from the investors would mislead them, and that this alone suggests that Defendants acted with scienter. Finally, Plaintiff argues that the Individual Defendants had a motive and opportunity to commit fraud because they feared they would lose their jobs if Emulex did not sell quickly and because they wanted to tout that they had successfully sold Emulex at a premium, knowing that doing so would help their individual reputations. In fact, Plaintiff's allegations of scienter fail for two independent reasons. First, Defendants' statements or omissions were not in fact false. And second, Defendant has not alleged facts leading to a strong inference that Defendants intended to deceive or mislead Plaintiff and the other shareholders by omitting the Premium Analysis.

**i. Contradictory Information**

As one of its reasons for recommending that shareholders tender their shares, Emulex noted in the Recommendation Statement that the offer price of $8.00 per share

"represented . . . a premium of 26.4% to the closing sale[] price [on the day before the merger agreement was executed]; a premium of 24.0% based on the 30-day average [of Emulex's stock price], a premium of 32.9% based on the 90-day average [of that stock price]; a premium of 4.8% based on the 52-week high [of the stock price]; a premium of 79.4% based on the 52-week low [of the stock price]; and a premium of 33.3% based on the International Brokers' Estimate System median price target [of the stock]." (Recommendation Statement at 25–26.) Plaintiff alleges that these statements were "materially misleading" because they suggested to Emulex's stockholders that the premium they would receive for their shares was significant. (FAC ¶ 8.) In reality, Plaintiff says, "the premium was drastically below the premiums stockholders had received in connection with similar merger transactions in recent years." (*Id.*) Defendants respond by arguing that the statements were not misleading because they did not create any impression of how the premiums Emulex stockholders would receive related to the premiums stockholders of other companies had received, even in comparable transactions. Moreover, Defendants point out, although the Emulex premiums were below the reported means and medians of the transactions that Goldman Sachs decided to include in the Premium Analysis, Emulex's premiums also fall *within* the range of premiums listed in the analysis.

Plaintiff is correct that an inference of scienter may exist when a defendant makes an affirmative, misleading statement despite having access to contradictory information. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) ("The most direct way to show both that a statement was false when made and that the party making the statement knew it was false is via contemporaneous reports or data, available to the party, which contradict the statement.") But that is not what happened here. The Recommendation Statement reports that Emulex stockholders were going to receive a premium on their stock and that Emulex believed that the premium was a reason to tender shares. The Premium Analysis reports that the Emulex premium was

below-average for the industry but within a reasonable range of outcomes.[5] These statements are not contradictory. The Recommendation Statement creates no impression in the reasonable reader that the Emulex premiums were either higher or lower than the average premiums in the industry.[6] And the Premium Analysis does not say that only above-average premiums are a reason to tender shares. No doubt many stockholders were delighted to receive a 26% premium on their shares.[7]

Plaintiff cites several cases in an attempt to shore up his argument that Defendants' recommendation based on premium amount is sufficient to support a strong inference of scienter. But each of Plaintiff's cases is distinguishable from the facts here. In *Reese v. Malone*, for example, the defendant oil company spilled 200,000 gallons of oil onto the

---

[5] Seventeen transactions conducted between 2011 and 2014 were surveyed in the Premium Analysis. The Emulex premium over its sale price as of the announcement—26.4%—is higher than four than that of the surveyed transactions, and lower than 13. (Recommendation Statement at 25.) The Emulex premium over the 52-week high price of Emulex stock—4.8%—is higher than four of the surveyed transactions, and lower than 10 (fewer data was available for 52-week highs). (*Id.*) When compared against only the 2014 transactions in the Premium Analysis, Emulex's 26.4% sale price premium would have rated sixth out of nine, and its 4.8% 52-week premium would have rated fifth out of seven. (*Id.*) In other words, although Emulex's premiums are in the bottom half of the distribution, they are decidedly within the normal range of transactions, and not "drastically below the premium stockholders of similar companies had received in connection with comparable transactions," as Plaintiff alleges, (FAC ¶ 7.) Additionally, the Premium Analysis does not contain any *analysis*—that is, any explanation of why Emulex's merger with Avago is more or less like any of the listed examples, or where in the distribution Emulex's premium should be expected to fall. Goldman Sachs was evidently not troubled by the Premium Analysis, determining that the $8.00 was fair to investors from a financial standpoint.

[6] In fact, the Recommendation Statement deliberately hedges by noting that its summary of Goldman Sachs' fairness opinion "does not purport to be a complete description of the analyses performed by Godman Sachs in connection with its opinion and is qualified in its entirety by reference to the full text of the written opinion of Goldman Sachs included as Annex A to this Statement." (Recommendation Statement at 29.)

[7] Moreover, the practical upshot of Plaintiff's argument is troubling. If the Court were to find a strong inference of scienter from these facts alone, it would mean that for any merger that produces a below-median premium (in other words, exactly half of all mergers), a target company may not report a premium amount as a reason to tender shares without saying exactly where in the distribution its merger premium falls. This would essentially convert the scienter element of § 14(e)'s anti-fraud provisions into an affirmative reporting requirement.

Alaskan tundra when a pipeline developed a leak. 747 F.3d 557, 563 (9th Cir. 2014). The company and its directors subsequently made a number of public statements reassuring investors that the faulty pipeline was anomalous and that the company's other pipelines were in good condition. In fact, the company's data indicated that the leaky pipeline was in comparable condition to other pipelines, suggesting that the company should have been more worried about future leaks. Sure enough, another pipeline sprung a leak a few months later, and investors brought suit. The Ninth Circuit found that a director's "detailed factual statement, contradicting important data to which she had access," gave rise to a strong inference of scienter. *Id.* at 572. Here, by contrast, no similar contradiction exists. Emulex did not say its premiums were above-average—only that they were a reason to tender shares. And the Premium Analysis does not say that the premiums were not a reason to tender shares—only that they were below-average. That is not a contradiction.

Similar problems exist with Plaintiff's citation to *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008). There, a company performed contracted work for the federal government, although the government would occasionally issue "stop-work" orders, following which the company was required to halt work and would receive no future income on the project unless work resumed. Work almost never resumed after stop-work orders, but the company continued counting work on contracts that had been stopped within its "backlog," or tally of pending work. The Ninth Circuit concluded that doing so gave rise to a strong inference of scienter, since the company knew the work was very unlikely to resume yet represented to investors that the work was in the company's queue. *Id.* at 988–89. No comparable allegations exist here, since Emulex's statements do not contradict any knowledge it or its directors had. Plaintiff's other cases are similarly distinguishable. *See Siemers v. Wells Fargo & Co.*, No. C 05-04518, 2007 WL 1140660, at *12 (N.D. Cal. Apr. 17, 2007) (holding that a strong inference of scienter existed when a defendant knew about, but failed to disclose, a "vast and secret

program of revenue sharing" while making false statements to the contrary); *Schlagal v. Learning Tree Int'l*, No. CV 98-6384 ABC (Ex), 1998 WL 1144581, at *2 (C.D. Cal. Dec. 23, 1998) (inferring scienter when defendants misstated earnings figures, among other things, despite having access to the true numbers).

Simply put, Plaintiff has not demonstrated that anything in Emulex's Recommendation Statement contradicted the Premium Analysis. Emulex did not represent in the Recommendation Statement that its 26.4% premium was above average. It only expressed its belief that the premium was fair and a reason for shareholders to tender their shares.

**ii. Failure to Disclose a Potentially Material Fact**

Plaintiff's second scienter argument is that he has raised a strong inference of scienter by alleging that Defendants failed to reveal a potentially material fact—the Premium Analysis—knowing that such a failure would likely mislead shareholders. In the Ninth Circuit, to successfully plead scienter based on an omission, a "plaintiff must plead a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco Partners*, 552 F.3d at 991. This standard is extremely difficult to meet, because even clear misconduct does not always raise a strong inference of scienter. *In re NVIDIA Corp. Sec. Litig.*, No. C 08-04260 RS, 2011 WL 4831192, at *8 (N.D. Cal. Oct. 12, 2011), *affirmed*, *In re NVIDIA Corp.*, 786 F.3d at 1046 (finding no strong inference of scienter even when a company knew of a significant product defect and failed to disclose it to investors, since "[s]uch behavior, at worst, reflects recklessness in the ordinary sense of the word"); *see also In re XenoPort, Inc. v. Securities Litig.*, No. C-10-03301 RMW, 2011 WL 6153134, at *4, 6

(N.D. Cal. Dec. 12, 2011) (holding that although a plaintiff successfully pleaded that the defendant misled investors by failing to disclose important differences between two drugs, a "strong inference of scienter" was not warranted because the failure was not a "highly unreasonable omission").

Here, Plaintiff argues that the simple omission of the Premium Analysis alone raises an inference of scienter. The Court is not persuaded. To begin with, the mere omission of information from a fairness opinion summary cannot alone justify an inference of scienter without a showing that the *content* of the omitted material renders the omission "an extreme departure from the standards of ordinary care," *see Zucco Partners*, 552 F.3d at 991. After all, a fairness opinion summary is just that—a summary—which cannot be expected to include every relevant or meaningful bit of analysis performed by a financial advisor. Indeed, investors would be done great harm if companies dumped entire financial analyses into recommendation statements and expected investors to sift through the mess. This Court has observed that "just because a particular analysis was worth considering by the board does not mean that is material to a reasonable investor" and therefore must be contained within a summary. *Masters v. Avanir Pharm., Inc.*, 996 F. Supp. 2d 872, 885 (C.D. Cal. 2014). The very fact that Plaintiff is attacking a *summary* of a fairness opinion casts doubt on his assertion that Defendants were intending to deceive investors as they undertook the task of determining what information was worth including in the summary and what information was not.

A better explanation is that Defendants realized that the Premium Analysis was minor in the scheme of the voluminous analysis performed by Goldman Sachs, and that the Premium Analysis's substance—that the Emulex premiums were below-average but otherwise ordinary for the industry—was unremarkable. Indeed, there are good reasons to doubt that the Premium Analysis says anything significant about the merits of the Emulex/Avago merger. For example, as the Recommendation Statement describes,

Goldman Sachs went to considerable lengths to conduct a Selected Companies Analysis, which compared Emulex with a list of companies "chosen because they are publicly traded companies with operations that, for purposes of analysis, may be considered similar to certain operations of Emulex." (Recommendation Statement at 27.) But none of the companies in the Selected Companies Analysis appear on the Premium Analysis (*i.e.*, they were not among the companies involved in the mergers described in the chart). Defendants may have simply concluded that because none of the companies very similar to Emulex were listed on the Premium Analysis, the mergers in that analysis were not similar enough to the Avago/Emulex merger to convey useful information about the premium—at least not useful enough to include in a summary of all the financial analysis Goldman Sachs performed. Moreover, even if the Court were to assume that the Premium Analysis was important, the fact of the matter is that the Emulex premium falls well within the range of premiums listed in the Premium Analysis. No doubt some investors would have found the Premium Analysis interesting and useful. But the utility of that analysis is in question, and the Court cannot say that it was an extreme departure from the standards of ordinary care to leave it out.

What to include in a fairness opinion summary is a judgment call. The Premium Analysis evidently did not trouble Goldman Sachs, who determined that the deal was fair despite knowing that the premium it produced was below-average. And there is no reason to believe that it troubled the Defendants—much less that it troubled them so much that they kept it from investors in an attempt to deceive them. Instead, what appears to have happened here is Plaintiff, having obtained limited discovery, scoured the financial analysis performed by Goldman Sachs looking for anything negative about the merger that did not appear in the Recommendation Statement. He has come up only with the Premium Analysis—a one-page chart demonstrating that a single element of the merger (the premium) was below-average when compared with other selected mergers.

The exclusion of that chart from the fairness opinion summary was not highly unreasonable and therefore does not give rise to a strong inference of scienter.

**iii. Motive and Opportunity to Commit Fraud**

Finally, Plaintiff alleges that a strong inference of scienter exists because the Individual Defendants were motivated to commit fraud by persuading shareholders to tender offers despite an inadequate premium. The facts Plaintiff alleges to support this theory are as follows: activist investors began pressuring Emulex's Board to sell the company in 2012, with two activist hedge funds in particular jockeying to place individuals on the Board and demanding "wholesale change at the Board level." (*See* FAC ¶¶ 60–67.) Ultimately two senior officers resigned and Board membership was expanded. (*Id.* ¶¶ 62; 69–70.) Plaintiff posits that other members of the Board feared for their jobs and ultimately decided to sell Emulex at a discount rather than face the "embarrassment of losing their jobs" as the activist investors continued to pursue Board change. (*Id.* ¶¶ 74, 133.) After receiving two "inadequate" proposals from private equity firms, Plaintiff alleges, the Board reached out to Avago and ultimately agreed to the merger at an unfair price. (*Id.* ¶¶ 80; 137.)

Plaintiff argues that these facts support a strong inference of scienter because the Individual Defendants figured that they were going to lose their jobs one way or another—either at the hands of the activist investors or by selling the company. Knowing that selling the company would be better for their reputations than getting kicked off the Board, the Individual Defendants resolved to the sell the company even if it meant duping shareholders as to what a fair price for Emulex stock was.

The problems with using this rationale as an inference of scienter are obvious. For one thing, *all* executives would like to enhance their reputations and conduct successful

transactions; that does not mean that all executives have a quasi-permanent motive for securities fraud. A number of courts have so reasoned, including the Ninth Circuit. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002) ("If scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."); *see also O'Connell v. Arthur Andersen LLP (In re Alphastar Ins. Group Ltd.)*, 383 B.R. 231, 259 (Bankr. S.D.N.Y. 2008) ("Every businessperson is concerned about his reputation. The motive to protect a business reputation is, therefore, too general to satisfy the pleading requirement for scienter."); *In re Moody's Corp. Securities Litig.*, 599 F. Supp. 2d 493, 515 (S.D.N.Y. 2009) ("Nor does the preservation of reputation constitute a cognizable motive for fraud."). As Defendants persuasively argue, "[e]very board member in America cannot start with one or two legal strikes in the scienter column based on a boilerplate accusation that she cares more about her reputation in the business world than shareholder welfare." (Dkt. 39 at 10.)

But even if it were realistic to use a board member's desire to pad his or her resume as a motive for fraud, there are compelling facts to suggest that the Board did not act in an effort to defraud shareholders and save their reputations. For one, Plaintiff acknowledges that activist pressure began more than *two years* before Emulex was sold; this delay does not square with Plaintiff's assertion that the Board sold Emulex in a rush to save face. Additionally, Plaintiff ignores that the Individual Defendants held significant amounts of Emulex stock and therefore had as much to lose as any shareholder from sale at an unfair price. Finally, Plaintiff himself alleges that Defendants rejected two inadequate proposals from private equity firms before approaching Avago, (FAC ¶ 78), who Plaintiff notes was "much more likely to submit [a] higher proposal[]" that the private equity firms, (*id.* ¶ 79). These facts are difficult to reconcile with Plaintiff's current argument that Defendants were desperate to sell at any price in order to

avoid losing their jobs. In short, Plaintiff's allegations of motive and opportunity on the part of the Individual Defendants do not give rise to a strong inference of scienter.[8]

**4. Holistic Analysis**

Having concluded that none of Plaintiff's individual arguments establish a strong inference of scienter, the Court is now required to "consider the complaint in its entirety to determine whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter . . . tak[ing] into account plausible opposing inferences." *Zucco Partners*, 552 F.3d at 1006. The Court finds that a strong inference of scienter is not warranted. Accepting the factual allegations of the complaint as true, Plaintiff essentially alleges that Defendants left an important financial analysis out of a fairness opinion summary in the Recommendation Statement, misleading stockholders into believing that the tender offer was a good deal when it was in fact a bad one. But Plaintiff's efforts to show that Defendants did so with "at a minimum, *deliberate* recklessness," *In re NVIDIA*, 768 F.3d at 1053, boil down to inferences that are less plausible than innocent alternatives. It *may* be true, as Defendants argue, that the Defendants deliberately hoodwinked investors by concealing the Premium Analysis. But it is certainly more likely true that Defendants legitimately believed the premium the merger would deliver to shareholders was a fair one, and that the Premium Analysis did not indicate otherwise (after all, Defendants could not reasonably include every piece of the fairness opinion in the Recommendation Statement, and the Emulex premiums fell within the range indicated on the Premium Analysis). Similarly, Plaintiff's story of how beleaguered Board members sought to sell Emulex quickly to shore up their reputations is not totally

---

[8] Plaintiff also alleges, in passing, that it has adequately pleaded scienter on the part of one of the Individual Defendants, Gregory S. Clark, because he "represented the interests of hedge fund Elliott Associates." (Dkt. 38 at 21.) Mere association with an activist investor cannot alone justify a strong inference of scienter.

implausible, but even combined with the other facts Plaintiff alleges, it is not a good reason to believe that Defendants deliberately bamboozled shareholders by concealing the Premium Analysis.

Additionally, some of Plaintiff’s allegations of scienter undermine each other. For example, as evidence for his claim that Emulex’s directors accepted a lowball offer for the company to protect their reputations, Plaintiff points to the LinkedIn profile of one of the directors, which boasts that the director worked to negotiate the merger, which delivered “a 26% premium over current stock price.” (Dkt. 38-6.) Assuming, without deciding, that this evidence is appropriate for judicial notice, it seems to actually cut exactly *against* an inference of scienter by undermining Plaintiff's other scienter allegations.[9] At one turn, Plaintiff asks the Court to infer scienter because, as Plaintiff tells it, the directors were so embarrassed that Emulex’s premium price was below the industry median that they refused to disclose (publicly available) industry norms to shareholders. Yet Plaintiff simultaneously argues that the directors touted the premium price online to boost their reputations, and that the Court should take this as evidence that they acted with scienter. In fact, it is good evidence that they were *not* so troubled by how low the premium was that they deliberately defrauded shareholders by concealing the Premium Analysis. This contradiction is a good example of how Plaintiff's hodgepodge of scienter allegations do not holistically add up to a strong inference that Defendants acted with the requisite state of mind.

---

[9] Defendants objected to Plaintiff’s request for judicial notice, but then withdrew their objection at the hearing the Court held on this motion. The Court GRANTS Plaintiff’s request for judicial notice as to certain SEC filings, including a single filing from a separate merger which includes a premium analysis like the one Plaintiff believe was wrongfully omitted here. (Dkt. 38 Exhs. 1, 2, 6.) A single filing from another case is not evidence of materiality, much less of falsity or scienter.

When Congress elected to require a "strong inference of scienter" in securities fraud cases, it set the pleading bar deliberately high in securities fraud cases. Plaintiff has not met that heightened pleading bar, and his § 14(e) claim is DISMISSED.

**B. Plaintiff's Other Securities Claims**

Plaintiff's next claim is for a violation of § 14(d)(4) and Rule 14d-9. Section 14(d)(4) provides that "[a]ny solicitation or recommendation to the holders of . . . a security to accept or reject a tender offer . . . shall be made in accordance with [the] rules and regulations [of the SEC]." 15 U.S.C. § 78n(d)(4). Rule 14d-9 in turn specifies that one of those rules is that recommendation statements "shall include . . . information required by Items 1 through 8 of Schedule 14D-9 or a fair and adequate summary thereof." 17 C.F.R. § 240.14d-9(d). Finally, Item 8 on Schedule 14D-9 requires a company's directors to furnish "information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading." *See* 17 C.F.R. § 240.14d-101; 17 C.F.R. § 229.1011. Using these provisions in tandem, Plaintiff argues that by omitting the Premium Analysis, Defendants misled investors, therefore breaching Rule 14d-9 and, in turn, violating § 14(d)(4). Defendant responds by arguing that there is no private right of action under § 14(d)(4).

Every federal court to consider the question whether § 14(d)(4) establishes a private right of action has concluded that it does not. *Dixon*, 2012 WL 2499931 at *6 n.2 ("Plaintiff also purports to bring a Section 14(d)(4) claim, but that provision does not give rise to a private right of action."); *McCreary v. Celera Corp.*, No. 11-1618 SC, 2011 WL 1399263, at *3 n.1 (N.D. Cal. Apr. 13, 2011) (same); *Washburn v. Madison Square Garden Corp.*, 340 F. Supp. 504, 508 (S.D.N.Y. 1972) ("Here again, we are cited no case granting a private right of action under [§ 14(d)(4)].") The parties agree that § 14(d)(4)

does not *expressly* create a private right of action, but Plaintiff argues that this Court should break from the above authorities and hold that that section creates an *implied* right of action. He points out that the Ninth Circuit has found that at least one other subsection of § 14(d) does create a implied private right of action—§ 14(d)(7)—and asks that the Court do the same here. *Epstein v. MCA, Inc.*, 50 F.3d 644, 649–52 (9th Cir. 1995), *reversed on other grounds, Matsushita Elec. Indus. v. Epstein*, 516 U.S. 367 (1996).

Although Plaintiff does not attempt to apply it, the traditional analysis for determining whether a federal statute creates an implied right of action is a test set forth in *Cort v. Ash*, 422 U.S. 66, 78 (1975). That test requires courts to ask four questions:

> First, is the plaintiff one of the class for whose especial benefit the statute was enacted—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally regulated to state law . . . ?

*Id.* (internal citations omitted). The fourth *Cort* factor—whether a cause of action is traditionally regulated to state law—does not apply here, in the federal securities context. But the remaining three *Cort* factors weigh against implying a private right of action. First, § 14(d)(4) focuses not on the shareholders ostensibly being protected by recommendation statements, but on the companies who are actually required to make those statements. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons.") (internal citations omitted). The statute does require that recommendation statements abide by SEC rules that are "appropriate in the public interest or for the protection of investors." § 14(d)(4). But just because certain *rules* exist to protect investors does not mean that individuals have a

private right of action to enforce a *statute* that requires companies' recommendation statements to abide by those rules. By contrast, § 14(d)(7), which the Ninth Circuit has held *does* create an implied private right of action, explicitly provides for payment to individual security holders, and therefore focuses on a class of persons benefiting from protection, and not a class of entities being regulated. *See* § 14(d)(7) ("When any person varies the terms of a tender offer . . . before the expiration thereof . . . such person shall pay the increased consideration to each security holder whose securities are taken up and paid for[.]")

Second, there is no indication of any legislative intent to provide for a private right of action. Section 14(d)(4) is a generic statute simply requiring that recommendation statements abide by the SEC's rules. If anything, the statute presumes SEC—not private—enforcement. And finally, it would be inconsistent with the scheme of § 14 to imply a private right of action from § 14(d)(4). Section 14 already has a provision providing for a private right of action to sue over material misrepresentations or omissions in recommendation statements: § 14(e). It would make little sense to look to § 14(d)(4)—a more general subsection—in an effort to cover the same ground. Plaintiff is candid about his reasons for attempting to wring a private right of action out of § 14(d)(4): he believes that claims under that subsection would only be required to plead negligence, and not scienter. But this argument cuts directly against finding a private right of action in § 14(d)(4). Why would Congress permit individuals to sue over misrepresentations and omissions in recommendation statements under § 14(e)—while requiring scienter—but then intend for the same individuals to bring parallel actions under § 14(d)(4) without the scienter requirement? There is no reason to believe that Congress intended that private individuals be permitted to sue under § 14(d)(4) and good reasons to believe otherwise. As the *Cort* factors weigh against finding a private right of action, the Court concludes that § 14(d)(4) does not create such a right, and Plaintiff's § 14(d)(4) claim is DISMISSED WITH PREJUDICE.

Finally, Plaintiff's § 20(a) claim fails because "to establish a cause of action under [§ 20(a)], a plaintiff must first prove a primary violation of underlying securities laws." *In re NVIDIA*, 768 F.3d at 1052. Plaintiff has not successfully alleged a violation of federal securities law, so his § 20(a) claim fails.

**C. Futility of Granting Leave to Amend**

Although the district court should grant the plaintiff leave to amend if the complaint can possibly be cured by additional factual allegations, *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995), the district court need not grant leave to amend if amendment of the complaint would be futile. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051–52 (9th Cir. 2008) (finding that amendment would be futile where plaintiff was granted leave to amend once and the amended complaint contained the same defects as the prior complaint). Here, although Plaintiff requested leave to amend should Defendants' motion be granted, the Court sees no reason to grant such leave. Plaintiff has already obtained expedited discovery and filed an amended complaint. *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 391 (9th Cir. 2002) (affirming district court's denial of leave to amend where plaintiffs in a securities fraud case failed to adequately allege scienter in an amended complaint). At the hearing on Defendants' motion, Plaintiff's counsel did not identify any facts nor offer any reason to believe that Plaintiff could allege any facts beyond what is currently in the FAC and the materials of which Plaintiff requested judicial notice, despite a direct question from the Court on the issue. Plaintiff has already put his best foot forward with regard to scienter and failed to adequately allege scienter in his amended complaint. It would be a pointless exercise and an unnecessary waste of the parties' resources to permit Plaintiff to file yet another amended complaint. This is especially true given the heightened pleading standard of PSLRA. *In re VISX, Inc. Securities Litig.*, No. C 00-0649 CRB, 2011 WL 210481, at *11

(N.D. Cal. Feb. 27, 2011) (denying leave to amend where plaintiffs had "not identified any additional facts that would provide plaintiffs' allegations of scienter the strength needed to satisfy the PSLRA").[10] Plaintiff has not alleged, and cannot allege, a claim for securities fraud based on Defendants' failure to disclose the Premium Analysis in connection with the Recommendation Statement.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED, and Plaintiff's claims are DISMISSED WITH PREJUDICE.

DATED: January 13, 2016

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

---

[10] Judge Breyer also denied leave to amend in *In re VISX, Inc.* because plaintiffs were "represented by experience securities fraud class action counsel who are intimately familiar with the PSLRA and the Ninth Circuit's stringent interpretation of its pleading standards," and because plaintiffs in that case amended their complaint "more than five months after the original lawsuits were filed." *In re VISX*, 2001 WL 210481, at *11. Both of these rationales are present here as well; Plaintiff is represented by competent securities counsel who understand the uphill battle of pleading scienter, and Plaintiff's amended complaint was filed on September 17, 2015, more than five months after he filed his original complaint in April. (*See* Dkt. 1; Dkt. 29.)